ALONZO COOK *v.* STATE OF MISSISSIPPI.

[43 South., 618.]

1. CRIMINAL LAW AND PROCEDURE. *Jury. Selection. Code* 1892, § 2389.

Where officers charged with the duty of selecting juries poured the slips of paper containing the names of the qualified jurors from the jury boxes and read and selected such as they wished, instead of drawing them by lot from the boxes, the selection was illegal and the panel should have been quashed, notwithstanding Code 1892, § 2389, declaring all laws relating to the selection of juries to be directory.

2. SAME. *Harmless error.*

Where in a murder case, after the exhaustion of the special venire, the court, on motion of defendant, directed the sheriff to call bystanders, not of the regular panel for the week, and none of said panel served on the case, the accused cannot complain, after conviction, of irregularities in its selection.

3. SAME. *Selection of juries. Procedure. Laws* 1896, *ch.* 84, *p.* 93.

Where the supervisors of a county prepared at its first meeting in the year a list of persons to serve as jurors in the circuit court and the names of the jurors for the different supervisors' districts were placed in separate boxes, without tops, and these were placed in a larger box with a sliding top, sealed with a paper cover, and the box was kept locked, the jury box was prepared in substantial compliance with Laws 1896, p. 93, ch. 84, providing that the names of the persons selected to serve as jurors from each supervisor's district shall be put in a separate box, which shall be kept sealed, etc., especially in view of Code 1892, § 2389, declaring that the provisions of law relating to the drawing of juries are directory.

4. SAME. *Drawing on wrong day.*

The preparing of a jury list for a term of court by the proper officers more than fifteen days before the commencement of the term, though the law provides that the selection shall be made within fifteen days of the opening of the term, is an irregularity, and does not warrant the quashing of the panel, under Code 1892, § 2389, providing that the provisions of the law in relation to the drawing of juries are directory.

5. SAME. *Prejudicial error.*

Where unfairness in the method of securing jurors is shown, a substantial right of a litigant is invaded, and the supreme court will set aside the verdict of such a jury on timely, objection being made, notwithstanding Code 1892, § 2389, which provides that the provisions of the law in relation to the drawing of juries are directory.

6. SAME. *Quashing jury box. Grounds. Sufficient evidence.*

To warrant the court in quashing a jury box, it is not enough to show that it would be possible for names to be substituted for the list prepared by the supervisors, as required by Laws 1896, p. 93, ch. 84, but the testimony must show that a fraud was committed, or such flagrant violations of the jury laws as constitute fraud in law.

7. SAME. *Qualifications of jurors. Code 1892, § 2355.*

A juror, stating on his *voir dire* that he can try the case fairly and impartially according to the law and the evidence, and that his only information consists of what persons have told him, is a competent juror, within Code 1892, § 2355, making a person who will make oath that he is impartial in the case competent as a juror, notwithstanding his having an opinion.

8. SAME.

Where the jury for the term was drawn in violation of the statute, but without purpose on the part of the officers drawing the same to disqualify from jury service the persons drawn, and where accused demanded a special venire, which was granted, and drawn from the jury box containing the list of persons selected by the supervisors to serve as jurors, the refusal to quash the jury box was not prejudicial to accused.

FROM the circuit court of Calhoun county.

HON. JOSEPH T. DUNN, Judge.

Cook, the appellant, was indicted and tried for the murder of one Crawford, convicted of manslaughter, sentenced to the penitentiary for twelve years and appealed—his second appeal —to the supreme court.

The facts as to the killing of Crawford, for which appellant and his brother, Daniel, were jointly indicted for murder, are set forth in the report of the case of *Daniel Cook v. State,* 85 Miss., 738, 38 South. Rep., 110. Severance and separate

trials of the defendants were had, the appellant on his first trial being found guilty of murder and sentenced to the penitentiary for life, from which he appealed—his first appeal—and the judgment was reversed, and the cause remanded for a new trial. *Lon Cook* v. *State,* 38 South., 113.

*Stone & Sivley,* for the appellant.

The first assignment of error is, that the court erred in overruling appellant's motion to quash the jury box, and also erred in refusing to order the sheriff to summon another venire. The second assignment of error is, that the court erred in overruling appellant's motion to quash the special venire drawn from the jury box. We discuss these two assignments of error jointly. The testimony taken upon these motions discloses the fact, that more than fifteen days before the convening of the regular March, 1906, term of the circuit court, the clerks of the circuit and chancery courts, together with the deputy sheriff of the county, met for the purpose of drawing the juries to serve at said term of circuit court. These officers, after opening the so-called jury box, spread the slips containing the names of county electors upon the table, with the names exposed to view, and each one of the officers, in turn, after looking over the names, selected an elector to serve upon the jury. This process was repeated, until a sufficient number of names were selected to constitute the grand and the petit jury for the term of court. The motion to quash the jury box, also sought to quash the regular jury, drawn for that term of court, because the drawing was not in accordance with the directions of Code of 1892, ch. 68, as amended by acts of 1896, p. 93. Code of 1892, §§ 2366 & 2367, providing for the manner of drawing juries in vacation, was not observed in any particular. Under Code 1892, § 2358, and acts of 1896, p. 93, the board of supervisors of each county are required in making up the jury box, to apportion from each supervisor's district, the names to be placed in the jury box, in

proportion to the number of electors in each district. The chancery clerk, Clements, testified that a regular number from each district of the county were placed in the jury box, although the five districts did not each have the same number of inhabitants. We, accordingly, submit that the jury box, as originally made up, was illegal, and should have been quashed. When the special venire was drawn from this illegally constituted jury box, and selection of the jury from this venire was made, appellant moved to quash the special venire, which motion was erroneously overruled. Code of 1892, §§ 2358, 2366 and 2376; Laws of 1896, p. 93; *Purvis* v. *State,* 71 Miss., 706, s:c., 14 South., 268.

This drawing of the jury, with the names of the jurors exposed and in full view, is clearly within the condemnation of this court in the recent decision of *Shepherd* v. *State,* 89 Miss., 147, 42 South. Rep., 544.

The testimony showed that the jury box was an old, wooden, ballot box, with a hole cut in it for the purpose of depositing votes, and a sliding top which could easily be adjusted without unlocking the box, and that the box was never kept sealed, thus, in its very construction, giving every opportunity for fraud. In fact, upon the hearing of the motion to quash the box, slips, containing the names of jurors, were removed from it while it was locked and supposedly intact. Whether there was, in fact, any fraud perpetrated upon appellant, we are unable to say, but we do strenuously insist that appellant's legal rights were recklessly disregarded, and if the three commissioners named had desired to commit a fraud, they would have had every opportunity so to do. The record shows that the sentiment of the county was very much wrought up over the killing which resulted in the indictment of appellant, and nearly a week was required in the examination of over three hundred venire men before a jury was finally secured. Under these circumstances, the appellant certainly had a right to ask that the jury box

be quashed, and that another special venire should be secured, in a method prescribed by law.

The third assignment of error is, that the court erred in refusing to sustain appellant's challenges for cause to certain jurors, Langston, Shippy and Reynolds, and required the appellant to challenge peremptorily these three jurors, when the testimony upon *voir dire* showed that they were each clearly disqualified to serve as jurors. At the time, appellant had, however, exhausted his twelve peremptory challenges. The juror, Langston, testified, that some time before the trial, he had heard from various sources about the killing, and, moreover, that a juror who had served on a former trial of the case, had told him what different witnesses at that trial had said the facts were, and, as a result, he, Langston, had formed a fixed opinion which would require strong evidence to remove. He practically stated that, if impaneled as a juror, he would enter upon the trial of the case with his mind made up, and it would so remain, unless the evidence was sufficiently strong to cause him to change his opinion, as he believed the facts which the juror told him had been stated on the former trial. While it is true, that Langston said that he had neither prejudice nor feeling in the case, and thought he could try appellant impartially, yet, he was clearly disqualified under the rule announced by this court in *Klyce* v. *State,* 79 Miss., 658, s.c., 31 South., 339. See also *Jeffreys* v. *State,* 74 Miss., 675, s.c., 21 South., 526; *Shepprie* v. *State,* 79 Miss., 740, s.c., 31 South., 416; *Fugate* v. *State,* 82 Miss., 189, s.c., 33 South., 942.

The juror, Shippy, testified that different persons told him the substance of what the witnesses for the state had testified to in the former trial of the case, and that one of these witnesses for the state, whose testimony was so detailed, was well known to Shippy as a reputable man who would tell only the truth. As a result of this, Shippy had already formed an opinion as to the guilt or innocence of the appellant.

As for the juror, Reynolds, he testified that he had an opinion which was based on the reports which he had heard in the past, and that it would take evidence to remove this opinion. He further stated, that as he was deaf, it was probable that he would not hear a portion of the testimony on the trial. From his having such an opinion, and because of his physical inability to hear freely evidence which was possibly necessary to change his opinion, we submit that he was an incompetent juror.

We do not think that the cases of *Gammons* v. *State,* 85 Miss., 103, s.c., 37 South., 609, and *Evans* v. *State,* 87 Miss., 459, cited by the learned assistant attorney-general to support his contention that the jurors were competent, are in point.

*H. H. Creekmore,* on the same side.

It is apparent, from the evidence introduced on the hearing of appellant's motion to quash the jury box, that the two clerks and the deputy sheriff, in drawing the juries for the term of the circuit court at which appellant was to be tried, pursued exactly the same method as was followed in the drawing of the grand jury which indicted the defendant in the case of *Shepherd* v. *State,* 89 Miss., 147, s.c., 42 South., 544.

It is contended by the learned assistant attorney-general that the selection of the petit jury in such manner did not constitute reversible error in this case, for the reason, that our jury laws are directory and not mandatory, and that, accordingly, appellant cannot complain of the illegality of the petit jury, inasmuch as he was granted a special venire at his request. Such contentions are not tenable, because, while our jury laws are directory, there must yet be some substantial compliance with the scheme of the law; and also because the appellant had the right to a choice between a special venire and a regular venire, legally drawn and impaneled. It was a violation of the rights of appellant to take from him his right to be tried by a regular venire, if he so chose. Yet the action of the jury com-

missioners, in drawing what purported to be a regular venire in violation of the statute, precluded the appellant from exercising such choice.

It is further submitted, that the jury box was not a legal jury box. If we waive the question whether the jury box as originally made up by the board of supervisors was legal, we still have presented the question whether, after the opening of the box by the two clerks and the deputy sheriff, the spreading of the names upon the table, and the examination of the same, the box continued to be, in contemplation of law, a legal jury box.

Eighty of the slips containing names were illegally taken from the jury box in the method prescribed, thus leaving the jury box practically robbed of two-fifths of the names originally placed in it. It is true, that the same number of names would have been taken from the jury box if the drawing had been done legally, but not the same names as would have been drawn, had the officers proceeded under the strict requirements of the statute law. Appellant was accordingly not given a legal trial. *Nealon* v. *People,* 39 Ill. App., 481.

The importance to the appellant of being presented with a jury box and a jury in every respect legal, is emphasized by the fact that it was exceedingly hard to procure a trial jury of any sort, almost a week being spent in the impaneling of the petit jury.

*George Butler,* assistant attorney-general, for the appellee.

The motion to quash the jury box, and requesting an order to the sheriff for the summoning of a special venire, was properly overruled. The law presumes that all officers perform their duty. Code 1892, § 2358, provides that the board of supervisors shall take the persons "as nearly as they conveniently can from the several supervisors' districts in proportion to the number of qualified persons in each." Appellant did not contend that this was not done, the only testimony throw-

ing light upon the matter, being the statement of the chancery clerk, Clements, that there were the same number of electors from each supervisor's district.

That part of the motion asking for the quashing of the *venire facias* for the first week of court, should have been overruled, as well as that part of the motion seeking to quash the special venire. No challenge to the array can be sustained, except for fraud. Code 1892, § 2387.

In *Campbell* v. *State,* 17 South. Rep., 441, the venire was drawn from an old box which had been prepared in 1902, notwithstanding the fact that a legal box had been prepared in 1904. This court held in that case, that the failure of the lower court to overrule the motion to quash, was not error.

No contention is here made by learned counsel for appellant, that any actual fraud was perpetrated, or in any way attempted against the rights of the appellant. It is no ground for reversal to allege that there was merely an opportunity for fraud. Such might truthfully be said of almost any business transaction, but no one would think of holding, that because there was merely an opportunity, not shown to have been acted upon, the transaction was vitiated. The laws are not intended solely for the protection of the accused. "It is, of course, of vital importance that cases be investigated by a fair and impartial grand jury and be tried by a fair and impartial petit jury, but beyond and above this the laws are intended to subserve the public welfare, and upon nothing is the public welfare more dependent than an unfaltering, strict and impartial enforcement of the criminal law." *Posey* v. *State,* 86 Miss., 147, s.c., 38 South., 324.

The verdicts of juries, and the judgments of courts, ought not to be set aside on slight or flimsy pretexts. In the *Posey case, supra,* it was contended that a fraud in law, if not in fact, was perpetrated by the conduct of the judge in adding a grand juror, but this court refused to adopt that view.

The case of *Shepherd* v. *State,* 89 Miss., 147, s.c., 42 South.,

544, does not sustain appellant's views here. In the case cited there was no challenge to the panel or to the array, but an objection to the "method of selection," rather than the "drawing" of individual jurors at a time when any error that might have been committed, could be corrected. Had a motion been made to quash the panel, in the case cited, we submit, that it should not have been sustained.

Learned counsel for appellant seem to contend, that because certain jurors were selected by the clerks and deputy sheriff, rather than drawn in the method prescribed by law, the whole venire was thereby rendered illegal. Yet, as above stated, in the absence of faud, we submit, there was nothing prejudicial to the rights of appellant in this. The jury, thus selected, were free and impartial, and obeyed the instructions of the court, in rendering their verdict. Hence, there is no good reason why the appellant should have objected to the regular venire for the first week, and have been thereby compelled to ask for a special venire. He, himself, raised the question as to the legality of the regular venire, and asked for the summoning of the special venire, and inasmuch as the special venire thus procured, was perfectly free and impartial, appellant is in no position to complain. *Russell* v. *State,* 53 Miss., 367.

The jurors, Langston, Shippy and Reynolds, were competent, and there was no error in overruling the peremptory challenges as to these jurors. The case of *Jeffries* v. *State,* 74 Miss., 675, s.c., 21 South., 526, and *Shepprie* v. *State,* 79 Miss., 740, s.c., 31 South., 416, relied on by appellant, have no application here. In each of these cases, the jurors concealed from the court on their *voir dire* that they had an opinion, and stated to the court that they were perfectly free and impartial, when, in fact, on a motion for a new trial, it was shown that a short while before being accepted as jurors, they had expressed an opinion to the effect that the defendant was not justifiable in killing the deceased.

The decision in the case of *Klyce* v. *State,* 79 Miss., 652,

s.c., 31 South., 339, is not in point, the decision being limited
to the particular facts in that case, as will be seen from the
opinion. In the case of *Fugate* v. *State,* 82 Miss., 189, s.c., 33
South., 942, the jurors there announced, upon their *voir dire,*
that they were prepared to decide the case without further tes-
timony, and on what they had heard. We think that this case
is controlled by *Gammons* v. *State,* 85 Miss., 103, s.c., 37
South., 609, and *Evans* v. *State,* 87 Miss., 459.

Argued orally by *C. L. Sivley,* and *H. H. Creekmore,* for
appellant.

MAYES, J., delivered the opinion of the court.

We shall not undertake to follow out and discuss each of
the errors assigned by appellants, for the reason that many
of them are so clearly answered in the record against the con-
tention made that we deem it unnecessary. We shall only dis-
cuss the serious questions raised in argument of counsel.

The first error assigned to which we address our attention
is that which involves the method in which the jury were
drawn from the jury box, who were to serve as jurors during
the term of court at which appellant was to be tried. Appel-
lant moved the court, after the special venire which had been
summoned was exhausted, to set aside the regular jury which
had been drawn, because of the illegality of the manner in
which they were drawn by the officers charged with this
duty under § 2367, Ann. Code 1892. Clements, the chan-
cery clerk, participating in the drawing of this jury, says
that the jury box was brought in and placed on the table. It
contained five small boxes on the inside, from which they were
to draw the jury list. He says he took the boxes out, one at a
time, poured the names on a table, and turned the faces of the
slips up so that he could see the names and know who the jury
would be for that term of court. Every person selected was
known beforehand, and this method of selecting the jury was

continued throughout, until the entire list had been selected to serve at this term of the court; that he only selected such names as he thought would do well to serve on the jury; that they drew no names from the boxes without knowing who they were placing on the jury. He was asked the question: "Did you pick the parties you wanted?" A. "Certainly. That is what it was done for." He was further asked this question: "When you turned the jury box out so you could get the names on the jury, did you turn the names up intentionally, so you could see the names of the men?" A. "Yes, sir; that is the way we have always been doing since I have been here." Q. "Did you pick the parties you wanted?" A. "Certainly; that is what it was done for." Q. "You got the ones you wanted, Mr. Johnson got the ones he wanted, and Mr. Ramsey did likewise, did he?" A. "I could not say as to them. I got the ones I wanted." Ramsey, the circuit clerk, was then introduced as a witness, and he corroborated Clements, in that he says he knew when he took the names from the box whom he was drawing, and where they lived, and all about them, and that that is the way this jury was drawn. Johnson is the next witness introduced, and he testifies to about the same thing, with reference to the selection of the jury for this term of court, as is testified to by Clements and Ramsey.

This shows the manner in which the jury was selected. Now, let us compare the methods used by the sheriff, the chancery clerk, and the circuit clerk, in drawing the jury that was to serve at this term with the requirements of the law. The legislature has been very careful to guard the manner of selecting jurors in such way as that it is largely a matter of chance as to who shall compose the jury at any term of the court, and we must suppose that the legislature did this for just and wise reasons. If this manner of selecting jurors could stand, there is no need for law upon this subject; but the statutes may be repealed, and the sole discretion as to the selecting of fit and competent jurors committed to the sheriff

and clerks of the county. It was never intended that the power of determining who was and who was not fit for jury service should be committed to the judgment of those charged with the duty of drawing the jurors from the jury box for service during a term of court. The guarding of the method by which jurors shall be selected has been a subject of great care by the legislature. By Laws 1896, p. 94, ch. 84, § 1, it is provided that "the board of supervisors at the first meeting in each year, or at a subsequent meeting if not done at the first meeting, shall select and make a list of persons to serve as jurors in the circuit court for the next two terms held more than thirty days afterwards, and as a guide in making the list they shall use the registration books of voters and select a list of names of qualified persons of good intelligence, sound judgment, and fair character." By this first provision the board of supervisors are required to make a selection of jurors who are to serve at the next ensuing two terms, and in making this list they are required to use the registration books, and to them, in making up their list, is committed the power to select from the list of names qualified persons of good intelligence, sound judgment, and fair character; and this is the only place in the law upon the subject of juries where it is given to anybody to make a selection of persons who are to serve as jurors, and this power is given to the board of supervisors in a very limited way, being safely guarded by requiring them to prepare a list of not less than two hundred, and committing the actual selection of the jury to a different body. By section 2 of this act it is provided that "at each regular term of the circuit court, and at a special term if necessary, the judge shall draw in open court, from the five small boxes inclosed in the jury box, slips containing the names of fifty jurors, to serve as grand and petit jurors for the first week, and thirty to serve as petit jurors for each subsequent week of the next succeeding term." The judge is not given the power by this section to select from the list prepared by the board of supervisors as provided above such men as

may suit him, but he is required to draw from the five small boxes the names of parties who are to serve as jurors. Thus in this section it is seen that the judge has no power to select, but must draw the names as he comes to them. In sec. 4 (p. 95) of the same act, in providing how grand jurors shall be drawn, it is provided that "the name of each juror shall be written on a separate slip of paper, and the name of each supervisor's district shall be placed in a separate box, hat, or compartment in open court, and there shall be drawn out by a person designated by the judge the number directed by the court." By § 2359, Annotated Code 1892, it is provided "that the jury list prepared by the board of supervisors, from which the jury who are to serve are to be drawn, shall contain not less than two hundred nor more than five hundred names, unless the judge of the district shall direct a greater number to be put on the list." By sec. 2360, after the list has been prepared by the board of supervisors, it is directed that it shall be immediately delivered by the clerk of the board, to the clerk of the circuit court, and by him carefully filed and preserved as a record of his office, and any alteration thereof shall be treated and punished as provided in case of the alteration of a record. By sec. 2361 it is provided that "the names of persons on the jury list shall be written on separate slips of paper by the clerk of the circuit court, and put in a box kept for that purpose, marked jury box, which shall be securely locked and kept closed and sealed except when opened to draw jurors."

It will be seen, upon a review of the entire law bearing upon this subject, that the legislature has been very careful to prescribe the method for the selection of juries, so as to take away from every person, or set of officers, the possible power of appointing the body of men who are to try any person's cause. Thus, to recapitulate, when the board of supervisors prepare the jury list, from which the jury is to be made up, by the act of 1896 referred to above, they shall select the list of names from the registration books and place upon the list persons of

good intelligence, sound judgment, and fair character. By sec. 2 of the above act, when the judge draws the jury, he is required to draw the names in open court, and is prohibited from disclosing the name of any juror. By sec. 4 of the act, when the grand jury is to be selected for the term, the names of all the jurors from each supervisor's district are written on a separate slip of paper and placed in a separate box, containing the names of the jurors from each supervisor's district, and in open court the names of such as are to compose the grand jury are drawn out, not by the judge, but by some person designated by him for the purpose. By § 2367 of the Annotated Code 1892, on failure of the judge to draw the jury as provided in sec. 2 of the act of 1896, the sheriff, chancery clerk, and circuit clerk are given the power to draw the jury. This high trust is confided, not to one of them, but to the three highest officers of the county, for the express purpose of having each see to it that the method of securing a fair and impartial jury is not violated. Can it be contended that the great care and caution thus shown by the legislature to secure to litigating parties a fair and impartial jury is but a matter of aimless circumlocution, and not a matter of cautious and careful guarding of a sacred right? Can it be argued, in the face of so cautious and careful guarding of the jury system by the legislature as is shown by the laws they have enacted to perfect a system for the procurement of a fair and impartial jury, thereby to protect the life, the liberty, and the property rights of the citizen, that all this law is to be stricken down by § 2389 of the Annotated Code of 1892, which declares that "all provisions of law in relation to listing, drawing, summoning, and impaneling juries are directory merely"? We cannot so decide. It was intended by the legislature to carefully and sacredly guard the right that each litigant had to have his cases heard by a fair and impartial jury, selected from the body of the county and in a fair and impartial way. No man, or set of men, under the law as it is written, have any power to de-

termine the fitness of a party to be drawn as a juror when his name has been placed in the jury box by the board of supervisors. The law is careful to require that a large number of names be placed in the jury box, from which the jury are to be drawn, the very purpose of which was to secure litigating parties against the possibility of having any person place upon the jury such persons as he might deem proper in any case. It is of the very essence of the purity of the jury system that this method be followed as directed by the legislature, to the end that no unfairness can possibly take place in the selection of juries. We would not affirm any case, either civil or criminal, where the verdict was rendered by a jury selected as this one was, if there had been a timely challenge. To do so would be to crush out the spirit of the jury system, and to establish a rule that would place litigating parties at the mercy of the honesty and wisdom of the parties who drew the jury.

We desire to say that in the history of this court there has never been a record brought to the court disclosing a more flagrant violation of the law with reference to the selection of jurors than is presented in this case. We feel it to be the duty of the court to make this comment in the light of this record, to the end that such practice and such method may be put an end to. It is evident from the record that the officers charged under the law with the duty of selecting the jury to serve during the term of this court, intended no wrong, but the practice indulged in by them, if sanctioned, would destroy the sanctity of a jury trial and make the administration of the laws under the jury system farcical. The constitution declares "that the right of trial by jury shall remain inviolate," and the legislature has undertaken to carry out this declaration of the constituion by guarding the manner of the selection of the jury in every way possible, to the end that a fair and impartial jury may be secured, and their selection not be intrusted to a single individual, or individuals.

But in this case the defendant has suffered no prejudice be-

cause of the illegal way in which this jury was selected, and therefore this case should not be reversed. We will proceed now to show why appellant was not prejudiced by the illegality above referred to. The record shows that when the case was called for trial appellant asked for a special venire. This special venire was granted and duly summoned, and after exhausting the special venire, when under the law it became the duty of the judge to call the jurors summoned for the week, the judge sustained a motion to quash the panel drawn for the week, and declined to let any jurors from the regular panel be put on the jury to try defendant, and directed the sheriff to summon from bystanders a sufficient number of good and lawful citizens of the county, duly qualified voters, to complete the panel to try the case. It will be seen from this that the court used in the trial of this case none of the jurors selected in the manner which is hereby declared to be illegal, but upon the application of appellant in the first place summoned a special venire, and, when this was exhausted, ignored the regular panel and ordered the sheriff to summon in bystanders. Therefore appellant was in no way prejudiced by the illegal manner in which this jury was selected by the officers selecting the jury to serve at this term of court. He was not indicted at this term, but was indicted some three years before; that is to say, in 1903, by a different jury. And as to the jury which indicted him there is no objection urged, so that none of these jurors participated in any way in the indictment or trial of appellant, and he cannot, therefore, claim to be prejudiced by this illegal method of selecting a jury.

We now come to the next question involved in this case; that is, as to the motion to quash the jury box prepared by the board of supervisors, from which the special venire was drawn who were to try this case. The case of *Purvis* v. *State,* 71 Miss., 706, 14 South., 268, cited by counsel for appellant, has no application here. It is shown in the *Purvis case, supra,* as stated in the opinion of the court, "that the board of super-

visors had, through their ignorance or obstinacy, disregarded the mandate of § 2358, Ann. Code 1892, in preparing the jury list from which the jury box was to be made." There is no such question presented here. It is clearly shown that the board of supervisors, in compliance with sec. 1, ch. 84, p. 94, of the laws of 1896, had prepared, at its first meeting in the year 1906, a list of persons to serve as jurors in the circuit court. It is true that the box in which these names were placed may not have literally corresponded with the requirements of the law, but it does in all substantial matters. It is shown that this box was an old ballot box with a sliding top, and that inside this box were placed five little boxes, in which the names of the respective jurors for the different supervisors' districts were placed, and that these little boxes did not have tops on them; but the hole in the ballot box was sealed with a paper cover, and the box was kept locked, and there was such a substantial compliance with the law as is contemplated by § 2389, Ann. Code 1892, providing that "all provisions of law in relation to the listing, drawing, summoning, and impaneling of juries are directory merely."

It is also objected to that the jury list was prepared by the sheriff and clerk of the chancery and circuit courts more than fifteen days before the term of court convened, when the law provides that the selection shall be made within fifteen days of the term of court; and this is urged as a reason why this jury should be quashed. As we have shown above, the jury selected at this time had nothing to do with the trial of appellant in the first place, and in the next place this is but another irregularity which is fully covered by the section of the code above quoted. This section of the statute—that is to say, sec. 2389—was enacted to prevent the selection of jurors from becoming vitiated by such irregularities. It was not intended by the legislature, however, that fairness in the selection of jurors should not be preserved; and whenever there is an invasion of this right, and whenever unfairness in the method of

securing jurors is shown to exist, a substantial right of the litigant is invaded, and this court, notwithstanding sec. 2389, which is merely aimed at irregularities, and not intended to cover up deliberate violation of the law, will set aside the verdict of any jury deliberately selected in a manner that is in violation of the law, whenever there is timely objection made by a party in either a criminal or civil proceeding.

This case is fully covered by the case of *Campbell* v. *State* (Miss.), 17 South,, 441, and in many respects is very similar to it, and the court properly overruled the motion to quash the jury box. In order to warrant the court in quashing a jury box, it is not enough to show that it would be possible for names to be substituted for the list prepared by the board of supervisors; but the testimony must in fact show that a fraud has been committed, or show such flagrant violation of the jury laws as that the acts proven would constitute a fraud in law. The attention of the officers of Calhoun county having been directed by the decision of this case to the many irregularities existing in their method of selecting juries, it is to be hoped that the errors complained of in this record will not be repeated, or longer continued in existence. If they are, there is a remedy under the criminal laws of the state.

The next assignment of error is that the court erred in refusing to sustain challenges for cause to Jurors Langston, Shippy, and Reynolds, thereby forcing appellant to peremptorily challenge the jurors. We have most carefully read the record containing the examination of these jurors, who it is charged were incompetent, and we have examined all of the authorities cited by counsel, and are unable to say that the action of the judge was incorrect in refusing to set aside these jurors for cause. In his direct examination Langston states positively that he has no opinion in reference to this case, and that there is no reason existing, that he knows of, to prevent him from doing absolute justice between the state and the defendant, and giving defendant a fair and impartial trial. Counsel for appellant

in his cross-examination succeeds in showing that this juror had heard one Pryor, a former juror, talk about the case, and Langston states that Pryor made an impression on his mind in reference to the case; but on reviewing his entire testimony, taking all that he said together, we are unable to say that the action of the trial judge in refusing the challenge for cause was not correct. Langston states that, if taken on the jury, he could try the case fairly and impartially according to the law and the testimony, and that his only information consists in what he heard Pryor say and in rumors. His answers are frank and fair, showing no bias in any way whatever, and he repeats that he is perfectly impartial and can give defendant a fair trial. The same thing characterizes the testimony of Juror Shippy, who says that he can give the defendant a fair and impartial trial, and, though he has heard many rumors of the case, he has heard none of the testimony, and that the rumors which he has heard will not be allowed to enter into or be considered by him, in determining the guilt or innocence of the defendant. Shippy states that he would try him according to the evidence adduced in the case, and would not try him in any other way; that he has no fixed opinion about it. Juror Reynolds' testimony is along the same line, and we are impressed with the belief, after carefully reading the examination of these jurors, that the action of the circuit judge in refusing to challenge these jurors for cause was not error. In a case of this notoriety, it would be strange indeed if there existed many qualified voters in the county of Calhoun who had not heard of this killing. It is only essential to the securing of a fair and impartial trial that a juror be able to discard the rumors which he may have heard, or the hearsay testimony, and be governed by the testimony adduced at the trial, and this these jurors have said they could and would do.

In the case of *Gammons* v. *State,* 85 Miss., 103, 37 South., 609, Justice Truly, delivering the opinion of the court, in an able and exhaustive discussion reviews all the authorities on

the subject of the competency of jurors, and in the light of this case we feel that it would be idle to again enter upon a discriminatory discussion of this subject. After a review of all the authorities of our court on this subject, he says: "An examination of the former opinions of the court on this subject simply serves to demonstrate the futility of all effort to frame any definite rule to be followed in passing upon the competency of jurors. The only general proposition really deducible from these opinions is that the decision in every instance must depend on the varying circumstances of the particular case. In determining the question of the competency as a juror, the court is not bound by the oath of impartiality made by the juror, for no juror can constitute himself the judge of his own competency, but should take into consideration the demeanor of the proposed juror; his answers, as indicating candor, or a desire to evade the question or conceal the truth; the impression or opinion which has been formed or expressed; the extent of knowledge of the facts of the case; the sources from which the information came—and from these, and from the many intangible, yet potent, elements which constitute personality, decide upon the existence of bias or animus either for or against the accused." In the language of the court in the *Gammons case, supra,* the question of the competency of a juror "in every instance must depend upon the varying circumstances in each case." The force and truth of this statement is readily seen when the authorities of our own state are examined and sifted. In the light of this record we cannot say that the circuit judge was wrong in holding that Jurors Langston, Shippy, and Reynolds were competent jurors. In the case of *Sam* v. *State,* 13 Smed. & M., 189, it was said that "every case must depend in some degree upon its own peculiar facts. Circumstances may exist which render a departure from the rule necessary and unavoidable, which in a different state of case would be inflexibly adhered to. In some cases of great notoriety and of general concern it might be impossible to find men in the

vicinage who had not formed some opinion of the matter." It would hardly be possible to find many qualified jurors in Calhoun county who had not heard more or less of this case. We think the testimony of these jurors clearly brings them within. the provisions of § 2355 of the Annotated Code of 1892, and that the testimony fails to show that these jurors had any such opinion as disqualified them as jurors. As was said in the case of *Posey* v. *State,* 86 Miss., 141, 38 South., 324: "It is vitally important that the cases be investigated by a fair and impartial grand jury, and be tried by a fair and impartial petit jury; but beyond and above this the laws are intended to subserve public welfare, and upon nothing is the public welfare more dependent than an unfaltering, strict, and impartial enforcement of the ·criminal laws." We are constrained to say that this defendant was granted a fair and impartial trial.

We do not deem it necessary to notice any other assignment of error in this case. The court was liberal·in the granting of its instructions, and we see no error committed in them in any way.

Finally, it is argued by counsel for appellant that the jury box from which the special venire was drawn should have been quashed, for the reason that the action of the officers charged with the duty of selecting the jurors from the box was illegal, and·therefore to the extent that they drew names from the box they disqualified the names of persons whom the defendant had a right to have in the box; that the withdrawal of these names lessened his chances of procuring the same jury that he would have had if these names had been left in there. This contention is good metaphysics, but too refined to be applied to the practical administration of law. Every man whose name is in the jury box is subject to jury duty. No person on trial has a vested right in any particular juror. He has an interest in seeing to it that the jury are selected according to the forms of law, and that a jury is not selected because it is for or against a particular litigating party. The illegal taking out of this

jury did not vitiate this jury box, it being in all other respects lawful. No man has a vested right in any particular juror, nor in any particular number of jurors in the box. The original number required by law is two hundred names, and at the first term of the court this number may be reduced to fifty or sixty, by drawing special venires and otherwise. It would not be argued that because these names were taken out the remaining ones were not qualified jurors, or that a party being tried would have any cause to complain because there was not the original two hundred in the box; neither does it vitiate the box because eighty names may have been unlawfully taken out. The remaining ones are competent. If there was any testimony in this record from which it might be reasonably inferred that it was the purpose of taking out these names in order to thus disqualify those taken out, and that the names left in the box had been selected and purposely left in the box in order that they might constitute the jury, a different question would be presented; but this is not the case here, nor is there any such proof. The officers picked the names out of the box that they wanted on the jury, but did not molest the other names that the board of supervisors had placed in the box as qualified jurors. Criminals are not to be tried on the doctrine of chances, or on metaphysical discussions of the law, but upon the facts in their case. All that they can ask is a fair and impartial trial before a fair and impartial jury. The case of *Nealon* v. *People,* cited in 39 Ill. App., 481, is a case from a subordinate court, standing pretty much alone in the rule it announces, applied to its interpretation of its own statute, and is too refined in its discrimination for practical use. *Commonwealth* v. *Valsalka,* 181 Pa., 17, 37 Atl., 405; *Rolland* v. *Com'rs,* 82 Pa.. 306, 22 Am. Rep., 758; *Sumrall* v. *State,* 29 Miss., 202; *Head* v. *State,* 44 Miss., 731; *People* v. *Coffman,* 59 Mich., 1, 26 N. W., 207; *State* v. *Hensley,* 94 N. C., 1021; *People* v. *Jackson,* 111 N. Y., 362, 19 N. E., 54. The authorities cited above, including the cases

from our own state, amply sustain the above announcement of the law.

*Affirmed.*

WHITFIELD, C. J., delivered the following dissenting opinion:

There are many assignments of error in this case, which it is not necessary to notice, beyond saying that there is no reversible error predicable of the giving or refusal of instructions, nor in respect to the admission or rejection of testimony. The verdict of the jury should not be disturbed because of any of these assignments.

But there are two assignments which manifestly ought to be sustained. The first is the assignment that the court erred in overruling the motion to quash the jury box. The record shows that the motion to quash the jury box was made and acted on when the court was "about to proceed to draw a special venire" from which to select the jury to try the defendant, having correctly quashed the regular venire of eighty names for the first two weeks. This regular venire consisted of fifty names from which the grand jury and the petit juries for the first week were to be taken, and thirty names from which the petit juries for the second week were to be taken. I can add nothing to the plainness and clearness with which my Brother MAYES has set out the extraordinary and utterly illegal method pursued by the two clerks and the sheriff in procuring these eighty names from the jury box. As he has stated, the very essence and soul of the jury law is that the names taken from the jury box to constitute the grand and petit juries shall be wholly drawn by lot, not picked or selected according to the whim and fancy of the clerks and the sheriff. Nor can I add anything to the earnest and most emphatic condemnation by my brethren of this method practiced, as set out in the opinion in chief, in making up these eighty names, as utterly illegal. I quote a passage from the opinion in chief, heartily to indorse

it. That opinion says: "Can it be contended that the care and caution thus shown by the legislature to secure to litigating parties a fair and impartial trial is but a matter of aimless circumlocution, and not a matter of cautious and careful guarding of a sacred right? Can it be argued, in the face of so cautious a guarding of the jury system by the legislature as is shown by the laws they have enacted to perfect a system for the procurement of a fair and impartial jury, thereby to protect the life, the liberty, and the property rights of the citizen, that all this law is to be stricken down by § 2389 of the Code of 1892, which declares 'that all provisions of law in relation to the listing, drawing, summoning, and impaneling of juries are directory merely'? We cannot so decide. It is of the very essence of the purity of the jury system that this method be followed as directed by the legislature, to the end that no unfairness can possibly take place in the selection of juries. If this manner of selecting jurors could stand, there is no need for law upon this subject; but the statutes may be repealed, and the sole discretion as to the selection of fit and competent jurors committed to the sheriff and clerks of the county." And again the court correctly said: "It was not intended by the legislature, however, that fairness in the selection of jurors should not be observed; and whenever there is any invasion of this right, and whenever unfairness in the method of securing jurors is shown to exist, a substantial right of the litigant is invaded, and this court, notwithstanding sec. 2389, which is merely aimed at irregularities, and not intended to cover up deliberate violation of the law, will set aside the verdict of any jury deliberately selected in a manner that is in violation of the law, whenever there is timely objection made either by a party in a criminal or civil proceeding." It will thus be seen that the court with great care and precision has accurately drawn the distinction, with respect to sec. 2389, between mere irregularities and the violation of the fundamental statutory provisions. It has declared in this case, as it was in the

case of *Sheppard* v. *State* (Miss.), 42 South., 544, that the making up of the grand or petit juries by picking the names— by intentionally selecting the names—according to the whim and fancy of the judge, or the clerks and the sheriff, and not drawing them by lot, so as to secure the fundamental purpose that the names of those who are to serve as grand and petit jurors shall not be known, is an outrageous violation of the provisions of law guarantying a fair and impartial jury trial, and not an irregularity covered by sec. 2389.

In all this I heartily concur, and most thoroughly indorse all that was said on this subject, both in the *Sheppard case* and in the opinion in chief in this case; but the remarkable thing to my mind is that the court, after thus clearly and emphatically announcing that there has been in this case a gross violation of the guaranty of a fair jury trial arising out of the selection instead of the drawing by lot of the eighty names, then strangely holds that this appellant was in no way prejudiced by this violation of the guaranty. The reason given by my brethren for that to me very singular holding is that none of the eighty men so selected served upon the jury trying this man, because the court quashed the regular venire for the two weeks, and defendant was indicted at a former term of the court by a different grand jury. But what possible aid can be derived from that fact, when the other inescapable facts stare us in the face that the one hundred and twenty names left in the jury box by the two clerks and the sheriff were, of course, just as clearly and indisputably selected and picked to be left as the eighty names taken from the jury box were selected and picked out of which to constitute the grand and petit juries? There is no possible escape from the logic of the proposition that the selection and picking of the eighty names tainted the whole jury with the vice of the selection and the picking, so that the one hundred and twenty names left were as much picked and chosen to be left, instead of having been left by lot, as the eighty picked and chosen to serve were picked and chosen out of which

to constitute the juries.   When the special venire of fifty was
taken from the one hundred and twenty names thus picked to
be left in the jury box, and some of the jury who tried this
man were taken from that special venire, and the appellant was
compelled to exhaust three peremptory challenges on three of
these fifty names constituting the special venire, the members
of the jury actually trying this man were thus in part a por-
tion of the special venire of fifty, and so part of the one hun-
dred and twenty left by selection, and not by lot, in the jury
box, and were just as indisputably picked and selected jurymen
as the eighty were picked and selected.   There is no logic on
earth which can escape this inevitable conclusion of correct rea-
son.    To state it so as to present the crux of the issue, so as to
show precisely wherein the appellant was vitally prejudiced in
the trial, we have but to note the self-evident proposition that
the panel which tried him was not the same panel which would
have tried him if the one hundred and twenty names had been
left in the jury box by lot; and can it be possible to defend the
proposition that when it is thus made perfectly clear that the
panel which actually tried him is not, because of the one hun-
dred and twenty having been left in the jury box by selection
and not by lot, the same panel which would have tried him
had the law been observed and the one hundred and twenty left
in the jury box by chance, nevertheless the jury was a legally
selected jury.   My brethren concede that the court correctly
held that the regular venire of eighty names should be quashed.
Why?   Because they were selected, picked, not drawn by lot.
Does not the same identical reasoning require the quashing of
the box with the one hundred and twenty left in it, also by
selection and picking, and not by lot?   The very soul, the
very essence, the very fundamental conception of the law is that
the jury that tries one for his life shall be a jury wholly drawn
by lot; and yet it is perfectly plain, from the record, that that
part of this jury which was taken from the special venire of
fifty, which fifty were taken in turn from the one hundred and

twenty left in the jury box by selection, was a part selected and picked, and not drawn by lot. Something is said in the opinion to the effect that the large number of names put in the jury box cures this. To my mind this is a patent fallacy. Take any two hundred names, or, for that matter, any one thousand names, put in the jury box, and select, as was done here, two-fifths of them by picking them to serve, and you necessarily inescapably, by the self-same act, pick also the three-fifths left to remain in the jury box. It is impossible for me to understand how my brethren fail to see that this is so. The picking and selecting of those that are left is necessarily involved in the process of selecting part to serve, and the whole jury box is thus vitiated by the method of selecting, which makes the entire jury box one not a jury box within the contemplation of the law, as was expressly held in *Purvis* v. *State,* 71 Miss., 706, 14 South., 268. The court held, in the *Purvis case,* that the whole jury box was void because of the wilful violation of the law by the board of supervisors, and no jury, and no part of the jury, was taken from that box in that case. So here the whole jury box is vitiated by infecting the whole of the two hundred names with the vice of selection and no jurymen could legally have been taken from that selected box to try this man without violating the legal guaranty.

The case of *Campbell* v. *State,* 17 South., 441, is upon a wholly different proposition, not involving the question of selection at all, and its citation is *malapropos* here. The precise question has been squarely presented and squarely decided in two cases. *Ferris* v. *People,* 35 N. Y., 129; *Nealon* v. *People,* 39 Ill. App., 481. This last case is on all fours, as to this proposition, with the case at bar. In the *Nealon case* there was a challenge to the array of the petit jury. It was shown in evidence that the jury list was made up by each of the members of the board presenting a list of names supposed to represent ten per cent of all the legal voters in the township or precinct represented by such members, in all nine hun-

dred and fifty-seven names; that these names were copied in a book by the county clerk kept for that purpose; that all of these names were then copied upon cards, one name on each card, and all said cards were placed in the jury box, from which box the panel of thirty jurors required for the term was drawn. Sec. 2 of that act (Rev. St., ch. 78), provided that the board should, from that list, make a second list by selecting from the first list a number of names equal to one hundred for the trial term of the circuit court, and in making this second list, or sublist, the board should take into consideration four qualifications not required in making out the first or ten per cent list, and that the board should check off from the ten per cent list the names of those selected to form the sublist, and the names upon the sublist should not again be selected as jurors until every person selected upon the ten per cent list to serve as a juror had been selected, or until the expiration of two years from the time of making the original list, when a new list should be made. The law further provided that this sublist should furnish the names to be written upon separate tickets, and placed in a box from which the jurors were to be drawn. The county board failed to obey the law requiring this sublist to be prepared from which the jury were to be drawn, and the contention was precisely, as here, that in this way the body from which the jury were to come was changed, and necessarily the jury which actually tried the defendant was a different jury from the jury which would have tried him, had the law been observed, and the jury drawn from the sublist, instead of from the original list, and the court said: "It therefore becomes necessary to determine whether the failure by the county board to obey or notice the section requiring a second sublist to be prepared is such a mere irregularity as could reasonably be said to work no positive injury to plaintiffs in error. . . . If the language above quoted from the supreme court means that in all cases an accused person, who has unsuccessfully challenged the array of jurors, must,

before he can successfully assign error upon the action of the court in overruling his challenge, show that some positive injury has been done him by the failure or irregularity, then any of the provisions of the jury law might be violated, and the accused could not be heard to complain. If a jury had been selected by the sheriff to try plaintiffs in error entirely without and against law, it might be that those selected had all the qualifications required by law, were good men, and had given plaintiffs in error a fair and impartial trial, and therefore they could not complain. We do not understand the supreme court to mean this, but that the irregularity complained of must be of such a character as would probably have produced a change in the panel, or presented a list of names to choose from different from those which would be produced by a compliance with the law. It is the right of an accused to have a jury selected in compliance with the law, and any substantial and material departure from the methods pointed out by the statute is certainly a wrong to him, of which he has a right to complain. The failure of the county board to select from the original or ten per cent list the sublist required by sec. 2 was, we think, a substantial departure from the law which would work a positive injury to the accused. The original list contains the names of voters without any reference to any of the qualifications of jurors required by sec. 2, except the first; *i. e.,* that they shall be inhabitants of the town or precinct. In making the second or sublist, the county board are required to exercise their judgment, and to use their personal knowledge of the men of their precinct, to present names of those only who are of the age of twenty-one years and under sixty, in the possession of their natural faculties, not infirm or decrepit, free from all legal exceptions, of fair character, approved integrity, sound judgment, well informed, and who understand the English language. The sifting of the original list by the members of the county board is not a mere useless form, but an important duty they owe to the public, and one which they cannot omit with-

out materially lowering the character and intelligence of those composing the juries of the county. The failure of the county board to perform their duty, in all human probability, presented to the accused in this case an entirely different panel of jurors from those which should have been presented, had the law been complied with. It is almost impossible to suppose that thirty names drawn from a box containing the nine hundred and fifty-seven names on the original list would be identical with those drawn from a box containing the names only of the sublist. The omission to observe the provisions of sec. 2 has therefore resulted in the selection of the jury from an entirely different class of men than that intended by the law, and did, in all human probability, present to plaintiffs in error different individuals to choose a jury from than would have been presented had the law been complied with. The true rule, we think, is laid down in *Ferris* v. *People,* 35 N. Y., 129, where it is said: 'The question arises whether any injury has resulted to the prisoner, or has he been prejudiced thereby? If we could see by any possibility that this neglect of duty on the part of these officers could have changed the panel, or in any manner have produced a different result, we might hesitate whether the prisoner should have a new trial.' "

If I understand the processes of logic and sound reason, there can be no escape from the conclusiveness of this reasoning. To my mind it is as clear as noonday that the panel which tried this man was, in part, a panel different from the panel to which he was entitled, if selection had not been resorted to and the jury had been chosen by lot. How can it possibly be said that a defendant, on trial for his life, is not denied the legal guaranty of a fair and impartial jury, when part of the jury trying him is a jury selected and picked according to the whim and fancy of the clerks and sheriff, and not drawn by lot according to the law? This error is, as the court correctly holds, not an irregularity curable by section 2389. It is vital. It goes to the violation of the legal guaranty. It is

a square overthrow of the fundamental spirit and purpose of the law itself. I may add, in passing, that the law required the board of supervisors, in making up the jury box, to apportion the names placed therein from each supervisor's district according to the number of electors in each. The testimony in this case shows clearly that an equal number from each district of the county was put in the jury box, although the districts did not have the same number of inhabitants.. See sec. 2358, Ann. Code 1892, and Laws 1896, p. 93, ch. 84. On the first assignment of error, therefore, that the court erred in not quashing the jury box, I think the court plainly erred to the great prejudice of the appellant.

The only other assignment of error I care to notice is that the court erred in compelling the appellant to exhaust a peremptory challenge upon Langston, a member of the special venire, instead of sustaining the defendant's challenge to set the juror aside for cause. Very much testimony was delivered upon his examination on his *voir dire,* but the one fact that stands out monumentally is that he heard a juror who had tried this man on a former trial detail the testimony of the witness on that trial. He testified that that gave him an opinion, and that it was a fixed opinion, and finally, after much examination, he testified as follows, after having said that he believed what the juror told him: "Q. And your opinion is fixed to the extent that you believe what this party told you? A. Yes, sir. Q. And it would require pretty strong evidence to remove that opinion? A. Of course, I believed what I heard him say. Q. And it would take strong evidence to remove what you have heard about it? A. Yes, sir; of course." It is true that afterwards, on further examination by the court, he said that he could fairly and impartially try the case according to the law and the testimony; but that sort of answer is completely disposed of by this court in the opinion delivered by PRICE, J., in the case of *Fugate* v. *State,* 82 Miss., 195, 33 South., 943. That judge said, with great power, on this very

point: "Most men, upon being asked by the trial judge, would answer that they could try a case impartially notwithstanding an opinion. Few would answer, though unconsciously to them the fact might be, that they had a desire to reach a verdict to which the evidence did not conduct, although their minds were so fixed, biased, or prejudiced as to easily reach a verdict to which the evidence did not logically conduct. Such is the constitution of the human mind, such the fraility and imperfection of human nature, that one could hardly be expected to declare himself controlled by bias or prejudice when under oath, and perhaps the more honest the man the more solemnly would he assert his freedom from both." And the juror in that case was held incompetent, although he answered that he had no bias or no prejudice, and could try the case fairly and impartially; the evidence further showing that he had heard certain parties detail what the witnesses had said in the courthouse, and that from that he had formed an opinion which it would take evidence to remove. Here how much stronger is the case, where the juror formed his opinion, which it would take strong testimony to remove, from hearing a juror who had formerly tried the case detail the testimony of the witnesses. And so, also, in the case of *Klyce* v. *State,* 79 Miss., 658, 31 South., 340, my Brother CALHOON said with great clearness and force: "It would nullify the constitutional purpose, and endanger the fairness of the trial, to hold a juror who has an opinion formed merely because he says he could try the case impartially. He may say so, and think so; but it is for the court to say whether he can in fact, viewed in the light of the weakness of human nature. We are constrained to think that a man who has heard the facts from the state's witnesses, and believes what they told him, and from that has formed an express opinion which he still retains, is not an impartial juror in the meaning of the constitution, whatever may be his idea of his power to try impartially." If these two cases are to stand, beyond all question, Langston was an incompetent juror, and the defendant's

challenge of him for cause should have been sustained. Great reliance is placed on the case of *Gammons* v. *State,* 85 Miss., 103, 37 South., 609, but what is said in that opinion, so far as decision is concerned, is, of course, to be taken in the light of the facts of that particular case. Indeed, the gist of the whole opinion in that case is that each case, as to this matter, must be decided according to its own peculiar facts. Now, what are the facts in the *Gamons case?* There the juror McCormick, who was held competent, stated (page 110 of 85 Miss., page 610 of 37 South.) that he had no bias, feeling, or prejudice against defendant, and would try him fairly and impartially on the evidence introduced, and would return a verdict according to law and evidence, and had no other motive in going on the jury; that he had heard of the case, and had seen it in the paper; that he had heard rumors, but that he had never heard any of the witnesses, and had never heard it talked in town. And so the juror Gillon testified to substantially the same thing, having never heard any one who personally knew anything of the case, and had formed the opinion which he had from what he saw in the newspapers, and he further said that he would go in the jury box "as free as I believe it is possible for a human mind to be." It certainly is too plain for comment that jurors who never heard the witnesses, never heard any person who personally knew anything about the case, and whose slight opinion was induced simply by what they saw in the newspapers, and who otherwise perfectly qualified themselves, could not be challenged for cause; but the case of those two jurors—Gillon and McCormick, in the *Gammons case*—is as far apart from the condition of Juror Langston in this case as the two poles. Langston had an opinion, a fixed opinion, which it would require strong evidence to remove, which opinion he had formed from listening to a juror who had once tried the case relate the testimony of the witnesses delivered on the trial. I cannot think, in any possible view of any well-considered au-

thority on this subject, that Langston should have been held a competent juror.

No one is further than I from reversing cases on mere irregularities in procedure. I do not believe that an instruction erroneously given or refused, or testimony erroneously admitted or excluded, or any other mere irregularity in procedure in the progress of a trial, should ever cause a reversal, when the court, looking back over the completed record, can confidently affirm that the right result has been reached, and that no different result could reasonably be expected on a new trial. That is one case. But when, as here, the party has been denied, as I think, his fundamental legal right with respect to the jury that is to try him, then there is no question, as my brethren have said, of mere irregularity; but the question is one presenting plainly a flagrant violation of a fundamental right, and wherever this is the case the party is manifestly entitled to a new trial. I dislike exceedingly to dissent from my brethren; but, when the doubt of the correctness of their conclusion reaches the dignity of a conviction with me, it then becomes my duty to dissent, however reluctant I may be to do so. The present decision squarely overrules the *Klyce case* and the *Fugate case, supra,* as to the principle affecting the competency of Juror Langston, and the *Sheppard case* as to the principle affecting the vitiation of the jury and the jury box by the selection, instead of the drawing by lot, of the regular venire—the eighty names. It is a decision which, in my judgment, sanctions in the concrete case what in the abstract it condemns—selection by intentional choice of grand and petit juries.