ALFRED (A SLAVE) v. STATE, 37 Miss. R., 296.

### HOMICIDE.

The legislature of this state has the power to provide for a division of a county into two districts, and the holding of a circuit court in each; and where this is done, it may also be provided that the grand and petit jurors for each district shall be taken alone from that district in which the court is held, in which they are required to serve, and not from the whole body of the county.

An opinion formed from rumor, so fixed as to require testimony to remove it, constitutes such a bias as to render a juror not impartial, and therefore incompetent.

Where a slave confessed to a stranger in the absence of his master, and afterwards confessed to his master, and giving his reasons for committing the deed, the introduction of the first confession against the slave did not authorize him to introduce in his own favor the second confession.

A slave, indicted for the murder of his overseer, cannot introduce as evidence in his defense that the deceased a few hours before the killing had forced the prisoner's wife to submit to sexual intercourse with him, and that this had been communicated to the prisoner before the killing.

Error to Hinds circuit court. WATTS, J.

The plaintiff in error was indicted in the court below for the murder of one Coleman. He was arraigned and plead not guilty. A special *venire* was drawn, from which a jury was selected for the trial of the prisoner. The prisoner moved to quash this *venire*, because it was not taken from the body of the county of Hinds, and for other reasons. On the trial of this motion, it was admitted by the district attorney that the names of D. Simmons, C. Hardy, M. Blake, and S. Lenity, had been returned by the assessor of taxes as persons liable to jury service in Hinds county, and had been deposited in box No. 1; and that in drawing said *venire* these names were drawn, but by order of the court rejected, and not included in said *venire;* that all of these persons were householders or freeholders of Hinds county, over twenty-one years of age, and under sixty years; and that none of them had been convicted of any infamous crime; but that they all resided in township five, range one east, which is that portion of Hinds county included in the district for which the circuit court is held at Jackson. The court overruled the motion, and the prisoner excepted.

The court then proceeded to empanel a jury to try the prisoner.

Peter Stubbs was tendered by the state to the prisoner, as a juror. He was asked by prisoner's counsel " if he had ever heard of this case ? " He answered that he had, " several times, from rumors." He was then asked, " Whether or not the rumors he had heard had made such an impression, or fixed such an opinion in his mind, either for or against the prisoner, that it would require testimony to remove it ? " To this he answered, " that it would require testimony to remove such impression or opinion from his mind." He also stated that the opinion he had formed " had fixed bias in his mind either for or against the prisoner." The prisoner challenged the juror for cause, and the court overruled the challenge, and the prisoner excepted. Seven other jurors were examined, and were found to have formed the same opinions as Stubbs. Each was challenged by the prisoner, and the challenges overruled by the court. Four of these were challenged peremptorily by the prisoner, and the

remainder were accepted by him " under protest, reserving the exception aforesaid." The bill of exceptions recites that the prisoner, by reason of being forced to challenge peremptorily the four persons above mentioned, exhausted his peremptory challenges before the jury was completed, and if he had challenged peremptorily the others, his peremptory challenge would have been exhausted before he reached the name of the last of said jurors challenged by him peremptorily.

The jury was empaneled, and the defendant then objected to going to trial, " because neither the special *venire*, nor the regular *venire*, nor those *tales* jurors, selected without being drawn, were any of them drawn or selected from the body of the county of Hinds, in this, that township number five, range one east, was altogether excluded, which was admitted by the district attorney. He further objected to trial, because the defendant "was not being tried by the circuit court of Hinds county." These objections were overruled, and the prisoner excepted. He then went to trial.

On the trial, Dr. James testified that, some time in last February, precise date not recollected, about dark, he, in company with two other gentlemen, then in the employment of Mr. Fronden, attracted by a noise they had heard, went from Fronden's house to his stable-lot, about two hundred yards distant; that when they got into said lot, witness saw the prisoner standing near the gate, and immediately asked him what was the matter. The prisoner replied, " I have killed the overseer." There was no other person but the prisoner in sight when witness and the others arrived at the spot.

John D. Fronden testified that, " some time in February last, about dark, I went from my house to my stable, having been attracted by a noise. Dr. James and two gentlemen with him, preceded me but two or three minutes." On cross-examination, he stated that the prisoner confessed to him that he killed the overseer (Coleman); immediately after he (witness) arrived on the spot; and that this could not have exceeded two or three minutes after Dr. James' arrival there. The prisoner then propounded this question to witness: " If the prisoner had stated to him in that confession, and immediately after he had

confessed the killing, that he (the prisoner) had killed Coleman; and if so, state all he said at that time." To this question, and any answer that might be made thereto, the district attorney objected; and his objection was sustained, and the prisoner excepted.

The prisoner introduced as a witness in his behalf a slave named Charlotte, who stated that she was the wife of prisoner, and belonged to J. D. Fronden. Prisoner's counsel then proposed to prove by Charlotte that, about nine or ten o'clock in the morning of the day in which the killing took place, that Coleman had forced her to submit to sexual intercourse with him; and that she had communicated that fact to the prisoner before the killing. The district attorney objected to the introduction of this evidence, and his objection was sustained, and the prisoner excepted.

The prisoner was convicted, and sentenced to be hung, which judgment he sued out a writ of error to have reversed.

*B. F. Trimble,* for plaintiff in error.

1. The court below erred in refusing to quash the special *venire,* because the law (acts of 1858, page 54), dividing the county of Hinds into two circuit court districts, and authorizing the drawing of the *venire* from only one district, violates the tenth section of the bill of rights, and is, therefore, unconstitutional and void. That section, among other things, provides " that the accused, in all prosecutions, by indictment or information, hath a right to a speedy and public trial by an impartial jury of the county where the offense was committed."

This clause, rightly interpreted, forbids the legislature from restricting the accused to any district or territory less than the county; and having been manifestly designed to protect the personal rights of the citizen, should receive, in the interpretation of it, the construction best calculated to promote the design of the framers of the constitution. They have, in this clause of the section, expressly declared that " the accused hath a right to a speedy and public trial by an impartial jury," &c. Manifestly, such a construction should be placed on this clause as to secure him an impartial jury, and allow him the entire

county from which to select his jury, and which does not limit him to any particular district or neighborhood, or fractional township, which is the case in the "Jackson township," under this special law. If the opposite construction of this clause is to prevail, we may be precipitated at once into all the ancient evils of the common law practice, and be thereby prevented from having an impartial trial, which, at least, is an undoubted constitutional guaranty. The interpretation insisted on by the counsel for the state would make the guaranty of an impartial trial the sheerest mockery; for you then place it in the power of the legislature to confine the accused in such narrow limits, that he is forced, as a choice between evils, to change the venue to another county; and thus another guaranty, in the same clause, that of a right to a trial in the county "where the offense was committed," is rendered virtually inoperative, and ceases to be any longer a protection to the accused.

It is, therefore, plainly deducible that the construction contended for is necessary, if a harmonious and consistent policy is to be imputed to the framers of the Constitution; and this construction is the proper one, if the authors of the bill of rights intended therein to secure to the accused, as far as possible, an impartial jury in the trial of their cases; for to allow the legislature to prescribe the limits within which the accused is to be restricted to select his jury, may operate as a virtual denial of a trial by an impartial jury in his county at all; and in that way destroy a plain guaranty in the bill of rights. This principle has been clearly recognized by this court. Shaffer v. State, 1 How., 238.

The common law at all times secured to the accused the right of a trial in the county where the offense was committed; for, as courts of criminal jurisdiction were organized in England, no other county could take cognizance of the offense. This right has descended to us as a fundamental principle in criminal jurisprudence, and its integrity has never been assailed either in England or the United States.

2. The court erred in excluding the statement of the prisoner to witness Fronden. The rule is settled beyond controversy, that when one part of a statement or conversation is admitted,

it must all be admitted. The statement or confession of the prisoner to Fronden was, in effect and substance, but a continuation of the confession he had made to James, and a technical rule should not be applied so as to exclude it. There was an interval of but two or three minutes between the time he confessed to James and when he confessed to Fronden; and as the law has fixed no time that must elapse, and as the rule that statements made at different times cannot be brought out because one is called for, is founded in the reason that the intervening time furnishes opportunity for deliberation and invention, cannot apply in this case, because the facts show that this could not have been the case, an application here would violate the spirit and reason of the rule, and might operate grossly to the prejudice of the accused. The statement that he might have made if allowed to proceed, might have, in the opinion of the jury, amounted to justification of the deed; and if the door is to be closed on testimony in this way, by the application of rigid technical rules, without regard to their reason or spirit, the boasted humanity of the law would become a system of ingenious frauds.

3. The exclusion of the testimony of Charlotte was clearly erroneous; for anything calculated to reduce the crime of murder to manslaughter is clearly admissible. Perhaps the jury may have regarded the provocation as a justification; and while the court may say it could not legally have this effect, still the effect of testimony is exclusively with the jury, as before remarked. The mischief of the contrary rule is apparent if we consider the effect of an acquittal by a jury in criminal cases. The humanity of our law regards the negro slave as a human being with lively emotions and social instincts, and regards with as much tenderness the excesses of outraged conjugal affections in the negro as in the white man. The servile condition of the negro has not deprived him of his social or moral instincts, and he is as much entitled to the protection of the laws, when acting under their influence, as if he were free instead of bond, and the white man degrades the species to which he belongs in denying them to him.

*T. J. Wharton*, attorney general, *F. Anderson* and *W. P. Harris* for the state.

1. It is contended by the plaintiff in error that the legislature had no power to exempt persons residing in the first district of Hinds county from the duty of serving as jurors in criminal cases arising in the other district, which it is alleged is done by the seventh section of the act. It is insisted that the plaintiff in error was entitled to select a jury from the whole county, or, in other words, from the body of the county, and that he was deprived of this right by the action of the court under the seventh section of the act.

The only provisions of the Constitution bearing on the point are the following:

" In all proceedings by indictment or information the accused hath a right to a speedy and public trial by an impartial jury of the county where the offense was committed." Art. 1, § 10.

" The right of trial by jury shall remain inviolate." Art. 1, § 28.

These provisions do not give the accused the right to select his jury from the *body of the county.* Their object and purpose evidently were only to secure him the privilege of not being required to *leave the county* for trial, nor of being required to submit his case to persons more distant from the scene of the crime than the courts of the county. For this purpose, an *impartial* jury of the county was required. That the jury should be *impartial*, and that it should be composed of residents of the county, and not of persons from other counties, are the only requirements made in this provision; and if they are complied with, it is manifest that, in all particulars, the institution of the jury was and is subject to the supreme control and power of the legislature. This is the rule adopted in most of the states. " But on the other hand," says Sedgwick, " the guaranty is to be reasonably interpreted. It was not intended by this provision to tie up the hands of the legislature so that no regulations of the trial by jury could be made; and it has been decided that the provision is not violated so long as the trial by jury is not substantially impaired, although it be made subject to new modes, and even rendered more expensive." Sedgwick on Stat. and Const. Law, 447.

In Connecticut, where a city charter provided that the jury should be taken from the freemen of the city instead of the body of the county, it was held that the provision was constitutional, even admitting it to be an innovation upon the common law. Colt v. Eves, 12 Conn., 243. The same court, in a previous case, held that within the reasonable intendment of this clause of the Constitution, if the trial by jury be not impaired, although it might be subject to new modes, and even rendered more expensive, if the public interest demanded such an alteration, it would not be in violation of the Constitution. Beers v. Beers, 4 Conn., 535, 536.

The case of Shaffer v. State, 1 How., 243, is not a decision of the question, while the whole reasoning of the case is in favor of the position assumed by the state.

It might well have been held in that case, that when, by the statute, a *venire* was required to issue to the sheriff, commanding him in general terms to summon a given number from the county, it would be error in the clerk to insert a clause in the *venire* to summon them from persons residing as near as may be to the place of the offense, since by the statute passed, which was certainly not in opposition to the Constitution, the *venire* was to come from the whole county.

But that is a very different question from that of the power of the legislature to exempt particular persons, or particular localities in a county, for reasons of public advantage and convenience, from jury service in the county at large.

The whole legislation on this subject, both constitutional and statutory, as well as the rules of the common law, has proceeded on the idea that it was the privilege of the defendant to have the jury come from as small a space and number as possible, that space being the *visne*, and that number being the hundredors of the hundred where the offense was committed.

Judge Sharkey, in the Shaffer case, says: " The common law was particularly careful in securing to individuals a trial by the jury of the neighborhood or *visne;* and hence it required that the jury, or a portion of them, should be of the hundred in which the cause of action or offense occurred; and if they were not, it was a cause of challenge." * * * " The rule pro-

ceeded from the reason that the inhabitants of the neighbor-
hood were more intimately acquainted with the merits of the
cause of controversy, and, therefore, better prepared to decide."
And again, " The rule of the common law evidently had its ori-
gin in a spirit of justice and humanity towards the accused
party, and the abuse of its humane indulgence was one cause of
the change.   *   *   *   The taking of our citizens from their
homes and friends to be tried by strangers, without the means
of a fair investigation, had, no doubt, due weight in the consti-
tutional arrangement."

Coke states the principles of the common law, as follows:
" Wherein the most general rule is, that every trial shall be out
of that town, parish, or hamlet, or place known out of the town,
&c., within the record, within which the matter of fact issuable
is alleged, which is most certain and nearest thereunto, the in-
habitants whereof may have the better and more certain knowl-
edge of the facts."   3 Coke on Littleton, 505, b. 3, c. 9.

" Both in civil and criminal cases, the common law is very
nice in requiring every issuable fact to be alleged, not only
within a county, but also within a parish, town, or hamlet, or
for want of either of these, some other known place of the same
county, not being a hundred, which probably was excluded as
too large a division, and if this rule was not observed, it might
be pleaded in abatement, or otherwise taken advantage of.
*   *   *   Nor is it difficult to account for stating a particular
place in the county.   The principal reason was, that if issue
was taken on the fact alleged, it might be tried by a jury of the
*visne* or neighborhood, which our ancestors conceived to be
more likely to be qualified to investigate and discover the truth
than persons living at a distance from the scene of the transac-
tion.   *   *   *   And if at least four of the hundred in which
the place was situated were not included in the panel returned
by the sheriff, it was a good cause of challenge to the array or
whole panel, or if four of such persons did not attend to be
sworn, the polls or particular jurors might be challenged."   3
Coke on Litt., 505, note 8, by Hargrave.

He adds: " However, though the ancient law continues in
force as to trials for crimes, yet it hath long been deviated from

in practice. Lord Hale, taking notice that even during his time he never knew an instance of a challenge for want of hundredors in treason or felony." Ib. 506, n. 8.

It is plain, from this brief history of the matter, that the privilege of selecting a jury from the whole county was never known to the common law. It is equally clear, that after the legislation alluded to, although no challenge to the array could have been had for want of a jury of the *visne*, provided the jury were of the county, yet it certainly would not have been ground of challenge that the jury did come from the *visne*, especially in criminal cases.

It is also clear that it has always been considered a privilege, especially of the defendant in criminal proceedings, to have the jury from the place, the scene of the transaction, and from the number of those most likely to be familiar with the transaction, and also with him; but that it never was a privilege to have the jury from the whole of any county. The object of the constitutional provision clearly was to prescribe the limit within which the rule might be relaxed; *that is to say, to provide that while the defendant should no longer be entitled to demand a jury of the .visne,* yet he should not be required to go from the county with his witnesses, nor be tried by a jury at a greater distance from the scene of the transaction than the county.

It follows, that if a party indicted obtains a jury which is of the county, that is, not from a greater distance than the county, and from a body of men of the county, his constitutional privilege is preserved.

That the legislature has always acted on this idea, is manifest. The system adopted for the selection of jurors, by drawing a certain number from a box, from whom the jury shall be empaneled, as well as the various exemptions provided by our statutes from jury service, are founded on the idea that a party is not entitled to select his jury from the whole body of the county, and that his constitutional privilege is preserved when the legislature protects him from being tried by any other jury than one that comes from the county (whether the body of it or not), and that is impartial.

Great numbers of persons who would otherwise be competent

jurors, are by the general statute exempted from jury service. "All officers in the executive department of the government, all judges and officers of the several courts, members of the boards of police, practising physicians, teachers of public schools, and ministers of the gospel, actually engaged in their respective employments, postmasters, keepers of public mills, and ferrymen," are so exempted. Rev. Code, 498, art. 127.

The legislature has frequently passed special laws for the benefit of various classes or bodies of men, exempting them from jury service.

So, also, all the names of persons, in any county, which are drawn from jury-box No. 1, to serve as jurors in any court, and who, at said court, are empaneled on the jury, are withdrawn from box No. 1, and placed in box No. 2, and there kept until all the names in box No. 1 have, in process of time, been exhausted. And thus, under our system, it so happens that a person charged with a criminal offense never had, and never can have, the selection of his jury from the whole body of the county. And it may happen, that when such person is put on his trial, a third, a half, or three-fourths, or nearly all the names in box No. 1 have been withdrawn and placed in box No. 2, so that he is forced to take his jury from the small number of those left.

The laws, it is true, are all passed for the purpose of dividing the jury service of the county, but they do, unquestionably, deprive every litigant, whether in a civil or criminal case, of the privilege of laying his case before a jury selected from the whole body of the county; and yet their constitutionality is admitted.

One of the main objects of the law in question, was to divide the jury service of the county, and to equalize it, or proportion it to the amount of business originating in the different districts.

If, in the sense of the constitution contended for, the party accused has the right to demand a jury from the whole county, and not a portion of it, he would equally have the right to demand that jury-box No. 1, before his *venire* is drawn from it, should have restored to it all the names in jury-box No. 2, and

also all the names of persons who are, by law, exempted from jury service; for there is no difference in principle between an exemption on account of the place of residence, and exemption on account of occupation, or for any other reason the legislature may think sufficient.

It is manifest, therefore, that all the constitution intended to secure to the citizen, is, that the jury shall be of the county, and not out of the body of it, and that the jury shall be impartial.

2. It is contended for the plaintiff in error, that the Jackson court is unconstitutional. The only part of the constitution referred to in support of this position, is the 15th section of article four, which says that, " A circuit court shall be held in each county of the state, at least twice in each year." This clause is not violated by the law in question.

That a portion of the time the court is to be held at Jackson instead of Raymond can make no difference, unless it can be shown that Jackson is not in Hinds county, or that the clause in question means that the circuit court shall sit only in one place in the county, instead of the county generally.

The constitution, sec. 13 of art. 4, provides : " That the state shall be divided into convenient districts, and each district shall contain not less than three, and not more than twelve counties." Section 14 of article 4, provides that : " The circuit court shall have original jurisdiction of all matters civil and criminal, within this state," &c. And article 5 provides, " That a circuit court shall be held in each county, at least twice in each year."

" It is to be observed, by these provisions, that it is a circuit court, not of the county, but of the state or district, and that it has jurisdiction in all matters civil and criminal within this state."

The requirement by the act, that it shall be held in two different districts in the county, and that a citizen of one district sued in the other, may have the venue changed, is no more a violation of the constitution than the statute which authorizes any citizen of the state, if sued out of his county, to change the venue to the county of his residence. It is not a law affecting the jurisdiction of the court, which is general, but simply giving

to the citizens of the two different districts the privilege of being sued at home.

In relation to the other assignments of error, the attorney-general cited Ogle v. State, 33 Miss., 383; Clare's case, 8 Gratt., 608: 3 Humph., 493; 1 Iredell, 81.

HARRIS, J.:

The plaintiff in error was indicted, tried and convicted in the county of Hinds, for the murder of one Coleman.

Under the act of the legislature, approved 2d December, 1858, dividing the county of Hinds into two districts, for the purpose of holding the circuit courts of said county, the special *venire* drawn and summoned for the trial of said case was composed of jurors residing in the second district of said county alone, the jurors residing in the first district having been excluded, when drawn from said *venire* by the clerk and sheriff.

Before the case was called for trial, a motion was made by counsel for the defendant to quash the special *venire*, because the same was not taken from the body of the county of Hinds; and upon hearing said motion, with the admission and proofs of the facts therein stated, said motion was overruled, and exceptions filed and allowed. And this constitutes the first ground assigned for error in this record.

It is insisted for the plaintiff in error that the act of the legislature, creating two districts in the county of Hinds, for holding circuit courts therein, and making provision for the drawing and summoning a special *venire facias*, for the trial of capital cases, from a district of said county instead of the body of the county, is in conflict with the 10th section of our bill of rights, and therefore void.

This point has been very fully and ably discussed on both sides, and we deem it sufficient, without repeating the grounds and authorities upon which our judgment rests, to refer to the elaborate briefs of counsel for the state, and to say that we have no doubt of the constitutionality of the act of the legislature in question. There was, therefore, no error in the court below in overruling this motion.

The only other grounds of error necessary to be considered,

are the rulings of the court in relation to the competency of certain jurors tendered by the state, and the rejection of the confession of the accused to witness Fronden, and the testimony of the witness Charlotte.

Among other jurors tendered by the state, Peter Stubbs was presented, and asked by defendant's counsel whether he had ever heard of the case. He said he had several times, from rumors. And upon being asked by defendant's counsel further, whether or not the rumors he had heard had made such an impression or fixed opinion in his mind, either for or against the prisoner, that it would require testimony of a character different from the rumors he had heard to remove such an impression, he answered that it would require testimony to remove or destroy such impression or opinion; whereupon defendant challenged said juror for cause, and the court disallowed said challenge. To which ruling of the court exception was taken, allowed, and filed, and is now here urged as error.

Under the repeated adjudications of this court, we are not permitted to regard this as an open question. It is well settled, that an opinion formed from rumor, so fixed as to require testimony to remove it, constitutes such bias as to render the juror not "impartial," and, consequently, under our constitution, to disqualify him for service. See Lewis v. The State, 9 S. & M., 118; Childress v. Ford, 10 S. & M., 30; Sam v. The State, 13 S. & M., 189; Nelms v. The State, 13 S. & M., 500; Collon v. The State, 31 Miss., 509; Williams v. The State, 32 Miss., 398; Ogle v. The State, 33 Miss., 383. This ground of error is, therefore, well taken.

We think there was no error in the rejection of the confession of defendant to Fronden, offered by the defense, nor in the rejection of the testimony of Charlotte.

For the error in the rejection of the challenge of juror Stubbs, let the judgment be reversed, cause remanded, and a *venire de novo* awarded.