## DONAHUE *v.* STATE.*

(In Banc. Feb. 8, 1926. Suggestion of Error Overruled Feb. 22, 1926.)

[107 So. 15. No. 25190.]

1. JURY. *Opinion of juror formed on rumor does not disqualify him if he is fair and impartial.*

Under section 2685, Code of 1906 (Hemingway's Code, section 2177), an opinion formed on rumor does not disqualify if the juror, in the opinion of the court after full examination, is found to be fair and impartial.

2. CRIMINAL LAW. *Judgment of circuit court as to qualification of juror is prima facie correct.*

The judgment of the circuit court as to the qualification of the juror is *prima facie* correct, and, unless this court, viewing a completed trial from the record, is satisfied that the jurors were not fair and impartial, the action of the trial court will be upheld.

3. JURY. *Trial judge should resolve all doubts as to juror's fairness impartiality, and freedom from bias and prejudice in favor of accused.*

In the examination of prospective veniremen in a criminal case, where such jurors have an opinion formed on rumor which they testify would yield readily to the evidence, the trial judge should resolve all doubts in his mind as to their fairness, impartiality, and freedom from bias or prejudice in favor of the accused person.

4. CRIMINAL LAW. *Confession to officer made voluntarily is admissible against accused.*

Where a person arrested for crime makes a confession to the officer having him in custody without any threat or inducement or expectation of favors shown, such confession is admissible in evidence, although the officer did not specifically state to the accused that such statement would be used against him.

5. HOMICIDE. *Dying declaration admissible only when declarant has abandoned all hope of recovery; improper admission in evidence of dying declaration, to prove corpus delicti, held not ground for reversal.*

Before dying declarations are received in evidence, the trial judge should be satisfied beyond all reasonable doubt that the declarant realized that he was *in extremis* when he made the statement. The declarant in such case must have abandoned all hope of recovery. But, where a dying declaration is improperly admitted to prove the *corpus delicti* the court will not reverse a conviction, where the defendant voluntarily took the stand and testified that he did the killing, and relates in detail the facts in reference thereto, where such facts, so related, show the defendant guilty of murder.

6. HOMICIDE. *Erroneous admission in evidence of dying declaration, in death penalty case, is not ground for reversal, when fixing of penalty at imprisonment on new trial improbable.*

The court will not reverse a case of conviction of murder carrying the death penalty because of an error in admitting a dying declaration, where the facts in evidence show that it is highly improbable that the jury on a new trial would fix the penalty at imprisonment for life.

*Corpus Juris-Cyc. References: Criminal Law, 16CJ, pp. 717, n. 39; 724, n. 22; 17CJ, p. 238, n. 26. Homicide, 30CJ, pp. 255, n. 24; 443, n. 77, 81. Juries, 35CJ, pp. 312, n. 99; 342, n. 93.

Appeal from circuit court of Kemper county.

Hon. J. I. Sturdivant, Judge.

Patrick Donahue was convicted of murder, and he appeals. Affirmed.

*L. P. Spinks,* for appellant.

I.  We are met at the very threshold with the proposition that of the twelve men who tried this defendant, nine of them said on their *voir dire* they had formed or expressed, or both, an opinion as to the guilt or innocence of the defendant. Many of the talesmen stated that they could not give the defendant a fair trial but that he would have to prove himself innocent. We submit that the *voir dire* examination of juror Watts as developed does not show that he was an impartial juror within the meaning of the law and that his opinion was not a mere impression, but an opinion that would combat evidence offered to overthrow it.

The record shows that the court had some little trouble in procuring a jury and it strikes us that in the effort to hasten the trial, the form of questions propounded led the jurors into committing themselves to their ability to try the case fairly and impartially. We submit that when a man is on trial for his life, no effort or patience should be spared in obtaining a jury, shown beyond every reasonable doubt to be fair and impartial. We submit further that when a juror evidences any hesitancy or doubt as to his ability to give the defendant a fair and impartial trial he should be excused; and when in reply to questions propounded to him the question of his fairness was here in doubt it would have been the better policy to ask the jury the direct question as to whether the opinion was a fixed opinion, which was not done by the court and the district attorney, but rather they, by the form of the questions, may have led the jurors into committing themselves to their ability to try the case fairly and impartially.

Section 26, Constitution of 1890, guarantees to every person accused of crime a trial at the hands of an impartial jury. *Nelms* v. *State,* 13 S. & M. 500, 53 Am. Dec. 94; *Cotton* v. *State,* 31 Miss. 504; *Mabry* v. *State,* 14 So. 267.

Since the enactment of section 2177, Hemingway's Code, this court has uniformly held that this statute was not meant to infringe upon the guarantees of section 26 of the constitution, but was meant to give the trial court some discretion in accepting on the jury, men of intelligence who had formed mere impressions or opinions, transitory in their nature. *Jeffries* v. *State,* 21 So. 526; *Klyce* v. *State,* 31 So. 339; *Sheppric* v. *State,* 31 So. 416; *Fugitt* v. *State,* 33 So. 942; *Gammons* v. *State,* 37 So. 609; *Cook* v. *State,* 43 So. 618. Therefore, section 2177, Hemingway's Code, does not make a juror competent merely because he takes oath that he can be fair and impartial, and it is still the duty of the trial court to see that a man is not tried for his life by a jury that is not fair and impartial.

It is clearly apparent here that the accused was not tried by the jury guaranteed to him by the constitution. Nine of the twelve jurors on their *voir dire* stated they had opinions, opinions that it would take evidence to remove, evidence that was good, positive, certain, definite. In other words these nine jurors in their own mind entertained a doubt as to their competency.

II. Coming now to discuss the admissibility of the dying declaration as testified to by Dr. Bell, we submit that the decisions in this state are uniform in holding that before the declaration is admissible, it must be shown beyond every reasonable doubt that same was made by the dying man under the sense of impending dissolution, or imminent death. *Fannie* v. *State,* 58 So. 2; *Wilkerson* v. *State,* 98 So. 770; *Hany* v. *State,* 92 So. 627; *McNeal* v. *State,* 76 So. 625; *Lea* v. *State,* 103 So. 368. Dr. Bell testified that the declarant asked and begged to

be taken to a hospital; that he, the witness, told him that he could not be helped at any hospital in the world, that he was going to die. When pressed as to whether the dying declaration was made before or after the witness told him he would not get well, the witness replied that he did not know. We submit, under the authorities cited above, that it was not shown beyond reasonable doubt that the declarant at the time of the dying declaration had abandoned all hope.

III. As to the admissibility of the alleged confessions, while two different confessions were testified to, and by different witnesses, the same rule of law is applicable to the admissibility of each. The "confession" to C. M. Gully was not shown to have been free and voluntary and uninfluenced by external causes. Here the accused, in response to questions put to him by one of several officers, had stated that he came to Meridian in a particular way; was later confronted with another man who contradicted him as to how he came; was locked up in cell with officers around him; and after all this made the statements asked to be considered as confessions. A confession to be admissible must be freely and voluntarily made, without any inducement or without any threats and without fear. *Carouthers* v. *State,* 83 So. 809; *Johnson* v. *State,* 65 So. 218; *Jones* v. *State,* 98 So. 150.

In this case the defendant made no confession until trapped by being with Gus Lang, who stated he brought the defendant to Meridian. Being thus trapped, and with some confusion in his mind as to just what might happen, being surrounded and questioned by the officers of the law, he made a confession.

As to the confession made to the witness by Earl Temple, we submit that it was incompetent because it was, in a sense, wormed out of the defendant while in jail by the witness, an officer of the law.

We further submit that each of the confessions were inadmissible because the *corpus delicti* had not been

proven independent of the confession.  *Bolden* v. *State,* 54 So. 241, and cases there cited.

In conclusion, please allow it to be said that if the defendant was not tried by a fair and impartial jury as required by the constitution, the question of his guilt or innocence does not enter.  *Jones* v. *State,* 52 So. 791. It is true that he took the stand and virtually admitted his guilt.  So did the defendant in the Jones case.  It is true that in this case there is no probability that any jury would render a verdict other than guilty on the evidence.  But a jury fully and completely without bias and prejudice, unswayed by passion, might not hang him. If he was not tried by a jury fair and impartial under the constitution, then there was no trial in truth and in fact  and he ought to have a new trial.

*Rush H. Knox,* Attorney-General, for the state.

I.  From a careful reading of this voluminous record, I fail to find a motion to challenge a juror about whose competency there was the slightest question.  In checking those who actually served on this jury I find that each man said in substance that he was impartial in the case; that even though he may have had an impression or an opinion as to the guilt or the innocence of the accused, in all instances the court inquired into the fact as to whether or not such a juror had any bias or prejudice of feeling or leaning in the case, and whether or not said juror had any desire to reach any verdict in the case except that verdict which the law and the evidence would naturally lead him to, following almost to the letter section 2177, Hemingway's Code  (section 2685, Code of 1906).

The judge who tried this case and who, it seems, conducted the *voir dire* examination of the jurors, held that the twelve men finally accepted by both sides to try this case were qualified to serve and that they were fair and impartial; that they had no bias, prejudice, feeling or leaning.

This court has repeatedly held, "that it will not inter-
fere with the discretion of the lower court in the em-
paneling of a jury unless it appears that there was gross
and injurious exercise of judicial discretion." I, there-
fore, most earnestly urge that there is no merit in the
first twenty-five assignments of error submitted by the
attorney for the appellant in this case.

In addition to calling the court's attention to section
2177, Hemingway's Code, I refer to Rule 11 of the rules
of this court: "No judgment shall be reversed on the
ground of misdirection to the jury, or the improper ad-
mission or exclusion of evidence, or for error as to the
matter of pleading or procedure, unless it shall affirma-
tively appear, from the whole record, that such judg-
ment has resulted in a miscarriage of justice." It will
be remembered also that it is provided in section 2211,
Hemingway's Code, that the drawing, listing, summoning
and the empaneling of jurors are directory merely.

II. It is contended also by the attorney for the appel-
lant that it was error for the court to admit the so-called
dying declaration, as testified to by Dr. Bell, and coun-
sel cites quite a list of authorities in support of his con-
tention on this assignment of error. The trouble about
this so-called dying declaration in this case is that there
was no dying declaration. Certainly, there was nothing
said by the deceased with reference to this appellant
whatever. He stated that he did not know who shot him
but that he was shot and he thought it was some boys
who were just fooling with him, and who were trying to
joke him, in other words. But, from the testimony of
Dr. Bell, whom the court heard in the absence of the
jury, it does seem that the deceased realized the fact
that he was in a dying condition and that he was under
the sense of impending dissolution.

It is true, the judge admitted the so-called dying dec-
laration, as he says, for the purpose of proving the
*corpus delicti;* but it is the state's contention that where
gun shots are heard by several witnesses and the wounded
party is hollering; where parties rush up to the

body and find him lying on the ground shot, as this party was, there in the dark hours of the night; where there is proof that immediately after shots were fired that parties were seen in an automobile nearby, fleeing from the scene of the tragedy, turning the lights on and off to conceal their identity and make sure their escape; where there was ample proof that he came to his death by gun shot wounds inflicted in such way and such a manner that it excludes every reasonable hypothesis that the wounds were self-inflicted, the *corpus delicti* has been proved *aliunde* the dying declaration. Here the *corpus delicti* was proved by the first four witnesses who testified for the state'before the dying declaration was offered. It is held in *Pitts* v. *State,* 43 Miss. 472, that the *corpus delicti* can be shown like any other fact by circumstantial evidence. This case practically overrules the *Sams case* in 33 Miss. 352. See also *Isom Walker* v. *State,* 105 So. 491.

Therefore, taking all the facts and circumstances into consideration, we find, first, the fact of the death of the deceased; and, second, the many facts as testified to by Mrs. Rush, Dr. Key and Dr. Gully of the existence of criminal agencies as the cause of his death. It is, therefore, not a question of whether or not the so-called dying declaration was admissible. Prior to the time it was offered, the state had proved a felonious homicide and sufficient physical facts to establish beyond any question of doubt, the existence of criminal agencies, and immediately following this evidence, we have an absolute confession that was competent by the appellant admitting that he was the guilty man. And in order to relieve a suspicion of doubt in the minds of the court and jury that he was the guilty party he took the stand in his own behalf and again confessed his guilt in no uncertain terms, going into the minute details of how he committed this atrocious and red-handed murder.

When a court is satisfied that justice has been done and that there is little reason to believe that a different

result would ensue upon another trial, the case will be affirmed.

· *L. P. Spinks,* in reply, for the appellant.

The attorney-general in his brief covering the competency of the jurors trying the case and the talesmen challenged peremptorily by the defendant contents himself with his conclusion that the trial judge followed the statute in the questions propounded to the jurors. But this court has held time after time that the mere fact that the juror would make oath that he was fair and impartial, without bias or prejudice, did not render the juror competent.

Neither does Rule 11 of this court apply. As said in the cases cited in our original brief there can be no harmless error when a constitutional right is invaded. The right to a fair, impartial, unbiased and unprejudiced jury is guaranteed by the constitution, and this guarantee applies regardless of guilt or innocence. *Jones* v. *State,* 52 So. 791.

The attorney-general virtually concedes that the dying declaration was inadmissible, but argues that since the *corpus delicti* had been abundantly proven without this, it could do no harm. We do not concede that it was sufficiently proven without the dying declaration. Neither did the trial court so consider it. Be that as it may, such testimony was very damaging to the defendant, and if incompetent, then its admission constitutes reversible error. It could but inflame the minds of the jury against the defendant. In it we have the dying man calling in agony to them, at it were. In it we bring, as it were, the wounded man into the court room in his agonies, and certainly no man would sit unmoved against the defendant under such circumstances.

Neither does the fact that the accused took the stand and admitted his guilt save the record. His testimony only established his guilt, which had already been established, under the argument of the attorney-general.

and this dying declaration had no other purpose than to inflame the minds of the jury, pleading with them to mete out the death penalty. Not being competent, it should have been excluded, even though the defendant took the stand and admitted his guilt, for this testimony was calculated to further prejudice the minds of the jury against the defendant.

Argued orally by *L. P. Spinks,* for the appellant, and *Rush H. Knox,* Attorney-General, for the state.

Etheridge, J., delivered the opinion of the court.

The appellant was indicted, tried, and convicted of murdering one Maurice Rush and sentenced to death, from which he appeals.

There are many assignments taken to the qualifications of the jurors; a separate assignment being made in the case of each juror challenged. These assignments, however, go to the qualification on their *voir dire,* and relate to the expression of an opinion, or the entertaining of an opinion, of the guilt or innocence of the accused. The examination of each of the jurors whose qualifications are complained of showed that the several jurors had formed an opinion on rumor, and that it would require some evidence to remove that opinion.

The juror Watts, may be taken as an example of these examinations, and his expression of opinion is somewhat more unfavorable to the appellant than that of the other jurors complained of, but may be taken as a type. From the examination of Watts we quote the following:

"Q. Have you formed or expressed any opinion as to the guilt or innocence of the defendant? A. Well, yes, sir.

"Q. From what did you form that opinion, if you formed one—rumor? A. It was rumor; yes, sir.

"Q. Would that opinion yield readily to the evidence in the case? A. Well, I do not know that it would.

"Q.   Could you go into this trial and, as you hear the evidence in the case and listen to the detailed evidence on the stand, hear the law and evidence, and render a just and righteous verdict in this case? A.   Yes, I suppose so.

"Q.   Have you any bias, prejudice, or ill will of any sort against this defendant? A.   No, sir.

"Q.   Have you any conscientious scruples against the infliction of the death penalty in a capital case? A.   No.

. . .

"Q.   You said that you had formed or expressed an opinion in this case, and that it was from rumor.   Do you know who the witnesses are in the case? A.   No, sir.

"Q.   Do you know whether you talked to any of the witnesses in the case? A.   If I have, I do not know it. I do not know the witnesses.

"Q.   You say you have formed an opinion? A.   Yes, sir.

"Q.   You have that opinion now in your mind? A. Yes, sir.

"Q.   That opinion now is fixed in your mind about it? A.   It is now; yes, sir.

"Q.   And before you can try this case on what may be developed from that witness stand, that opinion that you have formed that you now have in your mind will have to be removed? A.   It will; yes.

"Q.   Will it take much or very little evidence to re-move it? A.   Well, it will take evidence.

"Q.   Will it take a great deal or will it take very little evidence to remove it? A.   No; not specially to remove it.   It would take good evidence.

"Q.   In other words, before you could change that opinion, there would have to be some good evidence in-troduced on the witness stand to overburden the opinion that you now hold? A.   Yes, sir.

"Q.   It would not be easily removed from what might be developed? A.   I do not know that it would be easily

removed, but it could be removed by sufficient evidence, reasonable evidence.

"Q: . Could you go in that jury box with your mind absolutely free from what you have heard? A. Yes, sir.

"Q. Can you go into the jury box and indulge in the presumption of innocence in behalf of this defendant? A. How is that question?

"Q. Could you go into the jury box presuming that this man is innocent of this crime? A. Yes, sir.

"Q. But before you could give him that presumption . it would take evidence to remove the opinion that you now have? A. Yes, sir.

"Q. Have you read the papers, newspaper accounts given of this alleged homicide? A. Yes, sir.

"Q. Have you read any alleged statement that was supposed to have been given out by Patrick Donahue? A. I think I have.

- "Q. Have you been talking to people who have been up there at De Kalb this week? Were you here any day before this? A. I was here one time about forty minutes.

"Q. Did you come into the courthouse? A. Yes.

"Q. Were they in the course of the hearing of this case against Patrick Donahue or Gus Lang or George Harrison, or either one of these cases, in any manner while you were in the courthouse? A. No, sir. . . .

"By the Court: Q. I want to ask you one other question. Have you any bias or feeling of prejudice in this case? A. No, sir.

"Q. Have you any desire to reach any result in it except that to which the evidence may dictate? A. No, sir.

"Q. Can you be impartial in the trial of this case? A. I think so.

"By the District Attorney: Q. If you were selected to try this case, would it be your sole and only purpose to listen to the evidence and receive the instructions of the court, hear the argument of counsel, and a fair and

honest verdict render under the law and evidence to the very best of your ability? A. Yes, sir.

"Q. And will you do that? A. Yes.

"Q. Will you be fair to this defendant if you are selected to try the case? A. Yes.

"Q. Will you be fair to the state? A. Yes, sir."

After the twelve jurors were impaneled and qualified by the court, the attorney for appellant made objection to the whole panel because of the opinions shown on the *voir dire* examination. The court thereupon stated that each of the jurors had expressed his ability to hear the evidence and receive the instruction of the court and to try the case fairly and impartially notwithstanding such opinion, and stated that, if there were a single juror on the panel who could be shown not to have made such statements, he would sustain a challenge as to him for cause. There was no showing that any of the jurors had failed to make these statements. However, the appellant had exhausted his peremptory challenges.

On the trial the state introduced certain confessions made by the defendant after the killing and before the trial, in which statements defendant admitted that he did the killing.

The witnesses for the state, one of whom was the sheriff, stated that no threat had been made and no inducements held out to obtain the evidence. The other witness was not an officer, but testified that the accused and he conversed, and that the statements made were statements made without any threat, inducement, or hope of reward; that he merely asked the appellant about the case; and that he admitted he killed the deceased because he did not put up his hands when commanded to do so; and that accused further stated that, "If any highwayman tells you to put up your hands, you had betted do so, or he will shoot you," or words to that effect. The state also introduced, over objection, the statement of a physician who attended the deceased shortly after the shooting. This physician stated that he had occasion to examine

the deceased during the last hour of his life, and said that one of the bullets entered deceased's left side about the median line between the sixth and seventh ribs, and had its exit on the right side between the ninth and tenth ribs. That the wound looked like a .38 bullet wound. Deceased was also wounded on the left leg. On his head were two holes that went down the scalp an eighth of an inch, or a little more, and on both knees the skin had been "ruffled" up and was red. That the wounds on the scalp described went to the bone, but were not pistol ball wounds. That the pistol ball caused the death. That deceased lived about an hour or a little more after the shooting, and died at his residence in De Kalb, Miss.

"BY THE DISTRICT ATTORNEY: Q. Doctor, after you got Mr. Rush down to his house, I will ask if he realized the nature of his wound? A. He did.

"Q. I will ask whether or not he advised with you or you advised him as to whether he was going to get well or die? A. Yes, sir; I told him it was just a matter of a little while; that he would bleed to death anyway, and there was no possible chance.

"Q. What did he say to that? A. He did not say anything.

"Q. What statement, if any, did he make to you with reference to the uselessness of carrying him to a hospital? A. I told him there was no use at all, no matter what hospital he was in; that they could not possibly do him any good; that he was shot through the lungs and through the liver.

"Q. What did he say to indicate, if anything, to you that he had any hope of getting well? A. He did not say anything to me to indicate that he had any hope of getting well.

"Q. Did he realize his condition? A. Yes, sir.

"Q. What statement did he make to you, if any, as to how came he to be hurt, and what happened about that? A. He said he came out of his shop there, and some man told him to hold up his hands, and he thought

142 Miss.—3.

it was some boys pranking with him, and about that time he shot him.

"Q. The man shot him? A. Yes.

"BY THE COURT: Q. Was he bleeding much then, Doctor? What was his condition when he died? A. Yes, he was suffering a good deal.

"Q. Able to talk at all? A. Well, he would answer a question when you asked him.

"Q. Did he say anything to his wife or any member of his family about his condition? A. I did not hear him.

"Q. You told him he was going to die? A. I told him there was no possible chance for him to live only a little while.

"Q. Did you indicate how long? What did you say as far as you can remember how long he would live? A. Yes; I told him a little while, and marked across his body where it went—the bullet went in and come out.

"Q. What else did you tell him about any operation? A. I told him no operation in the world would save him. I said, 'If you was in the Johns Hopkins Hospital, they could not save you.'

"Q. What did he say? Did he make any reply at all to you? A. I do not think he did, Judge; he asked me if I could do anything for him.

"Q. That was when you first got to him? A. No, sir; that is after we got him home.

"Q. I mean, that was in the first part of it more? A. Yes.

"Q. In reply to that, he did not say anything? A. No, sir.

"Q. After you told him that, Doctor, did he still beg you to help him? A. Yes; he would beg for something; he was suffering.

"Q. How is that? A. He was suffering, and would call out for something for him.

"Q. To do something for him? A. Yes, and he remarked that he was bleeding to death.

"Q.   That he was bleeding to death? A.   Yes.

"Q.   When he asked you to do something for him, what did you understand from what he said, or anything else, what he meant by that? A.   That he was suffering.

"Q.   He wanted something for what purpose? A.   To stop him from suffering.

"Q.   To keep him from bleeding so? A.   Yes.

"Q.   Did he say anything to indicate that? A.   He was just lying, turning from one side to the other, and calling out.

"Q.   What would he say? A.   He would say, 'Oh Lord,' and 'Can't you do something for me,' and 'Give me some water, I am bleeding to death.'

"BY DEFENDANT'S COUNSEL:

"Q.   Dr. Bell, when he told you that somebody shot him, what was it he told you about who shot him? I do not recall the language used? A.   The best I can remember it, when I asked him who shot him, and he said he did not know, somebody told him to hold up his hands, and he thought it was some of the boys that were just playing. He used those words.

"Q.   Doctor, was that before or after you told him that you could not do him any good at a hospital? A.   I do not know, sir."

The witness further said that, to the best of his recollection, he thought it was after he told him he could not live.

Deceased's wife testified that he said to his pastor in her presence, "Brother, they have got me;" that he was speaking to the minister and she supposed by that he knew he would not get well; that he did not make any statement to her, but, as Dr. Bell stated, he said he was bleeding to death; and that he was suffering on the inside. By THE COURT: "All right; I think the proof is sufficient. The only purpose is to prove the *corpus delicti.* It does not connect anybody with it." This declaration was objected to, overruled, and exception taken.

The defendant testified on the witness stand that he shot the deceased; that he and Lang and Harrison had planned to rob the deceased as he came out of his shop; and, as deceased came out of his shop, that he, the defendant, threw his gun on him, and ordered him to put up his hands; that when he did not do it the defendant shot him, and kept shooting until he emptied his gun. Defendant made a detailed statement of his life prior to the killing, showing that as a child he was engaged in aiding his father run a "moonshine" still in the mountains. That his father was cruel and brutal to him. That he ran away from home when about thirteen years old, and went into the state of Missouri, and there stole a motor boat at the instance of a person who offered him one hundred fifty dollars to deliver him the boat at a designated place. That he was caught with the boat and sentenced to the reformatory. That he served out his term. That he then went into the state of Illinois, where he again committed crime, and was sent to the reformatory of that state, and was then discharged, and went into the Dominion of Canada, and served in the World War, seeing service in Europe. After the war he returned, and was discharged and went into the state of Illinois, and there committed burglary, for which he was sent to the penitentiary. That while in the penitentiary he was associated with "hard boiled" men, desperate criminals, and, while so associated with these desperate men, he discovered a plot to assassinate the warden who had been kind to the defendant. That he revealed the plot to the warden, and in consideration of this he was granted a parole or discharge from the penitentiary. That he came South, and finally came to Meridian, Miss., where he was employed to labor in the Black Water Swamp in Kemper county in the logging business, where he came in contact with Lang and Harrison. That on the evening of the robbery and killing he took supper with Harrison and Lang, and they got in a car after supper, and went east on the Mobile & Ohio Railroad to

Porterville on that railroad, and up the railroad to Electric Mills and to Scooba, at which place Lang procured some cartridges. Lang had already furnished him with a pistol, and they had planned a robbery to get some money to make a payment on Lang's car, which was then due. That Lang went into the barber shop of the deceased, and found out that deceased had twenty-five to thirty-five dollars in cash, and it was planned that Harrison and the defendant would hold Rush (the deceased) up, and procure the money, and that Lang would go down the road, and that they would pick him up in the car after the robbery.

There were no eyewitnesses other than Donahue, the defendant, who testified, but there was testimony as to hearing the shots and the outcries of Rush, and that shortly after the shooting and the outcries a car passed down the road, going in the direction of Meridian. The witness who described it said he was attracted by the shooting, and went out on his front porch, and saw the light flash on the car when it started. That there was some little trouble in getting the car started, and that the light would flash on, and then be turned off, that the car ran a little distance when the light would be flashed on again, and in this manner the car passed the residence of this witness who lived on the Meridian road in the town of De Kalb. That he could see men in the car, but could not identify these men. That after the car passed the witness he went to the scene of the killing, and notified the sheriff, and that the sheriff went in pursuit of the car. That the car when it passed witness' house did not have a tag on it. The sheriff proceeded to Meridian, and with the aid of the policemen discovered Donahue (the defendant) registered at a hotel under an assumed name, and arrested him. That the sheriff then made an investigation, and found Harrison and Lang in Lang's car, which car did not have a license tag on it. That in the back of the car the sheriff found a pistol with the handle broken. Pieces of the pistol handle were found

in De Kalb at or near where Rush (the deceased) was found lying after the shooting. These pieces fitted into the broken handle of the pistol. After being arrested, Donahue made the confession above outlined to the sheriff.

The attorney for the appellant in his brief and argument confesses that the evidence establishes the guilt of the accused, but insists that, inasmuch as the law permits the jury to fix the penalty at life imprisonment instead of death in any case regardless of the guilt or heinousness of the crime of the accused person, the appellant did not secure that fair and impartial jury guaranteed to him by section 26 of the state constitution.

Section 2685, Code of 1906 (Hemingway's Code, section 2177), provides that an opinion does not render incompetent a juror in a criminal case under certain conditions set forth. This section reads as follows:

"Any person, otherwise competent, who will make oath that he is impartial in the case, shall be competent as a juror in any criminal case, notwithstanding the fact that he has an impression or an opinion as to the guilt or innocence of the accused, if it appear to the satisfaction of the court that he has no bias or feeling or prejudice in the case, and no desire to reach any result in it, except that to which the evidence may conduct; but any juror shall be excluded, if the court be of opinion that he cannot try the case impartially, and the exclusion shall not be assignable for error."

This section of the Code has been adjudged not to be in conflict with section 26, Constitution of 1890. *Green v. State,* 72 Miss. 522, 17 So. 381. The *Green case, supra,* criticised the decisions of the court in *Logan* v. *State,* 50 Miss. 269. In the course of the opinion in the *Green case* the court said (72 Miss. at page 526, 17 So. 382):

"We have, perhaps unnecessarily, protracted this examination of what is to us a very simple matter, but the suggestion of the court in *Logan* v. *State,* 50 Miss. 269,

that all the authorities concurred in upholding the rule that an opinion entertained by a juror, which would require evidence to remove, disqualified him; and that such juror was not an impartial one within the meaning of the constitution, and that an act of the legislature 'which should encroach upon the qualifications of jurors in such wise as to weaken or endanger their impartiality, would be an infringement of this constitutional privilege,' has led us to make a more extended examination than we otherwise would have done. All the state constitutions contain the provision preserving the right to trial by 'an impartial jury.' An examination of the authorities cited in the note by Thompson & Merriam on Juries, to which we have referred, will demonstrate that the rule so frequently applied in the decisions in this state was against the decided weight of authority elsewhere, as was recognized by Judge HANDY in his dissenting opinion in *Williams* v. *State,* 32 Miss. 397.

"Notwithstanding the remarks of the judges delivering the opinions of the court in *Logan* v. *State,* 50 Miss. [269], and *Alfred* v. *State,* 37 Miss. 296, we are entirely satisfied that it was within the legislative power to change the rule as has been done, and that in the present case the juror was rightly held to be competent."

In *Klyce* v. *State,* 79 Miss. 652, 31 So. 339, it was held that it is not necessarily implied that a man is not competent to serve as a juror who has an opinion. The *onus* is on the court in the exercise of its enlightened discretion to decide whether the person tendered as a juror can try the case impartially.

In *Gammons* v. *State,* 85 Miss. 103, 37 So. 609, it was held that a juror who had heard rumors, but who had never heard any of the witnesses; that he had an opinion from what he had heard; that though he had such opinion he could give defendant a fair trial; that he had not heard anything from a person who knew the facts, but had formed an opinion from what he had seen in the newspapers, was held competent.

In *Evans* v. *State,* 87 Miss. 459, 40 So. 8, it was held under this section that jurors who have an opinion based on rumor which they have heard, but which may be removed by the evidence, and who have not talked to the witnesses, and who have no prejudice against the accused, and state that they can give a fair trial on the evidence, uninfluenced by the rumors, were held competent. See, also, *Cook* v. *State,* 90 Miss. 137, 43 So. 618.

In *Whitehead* v. *State,* 97 Miss. 537, 52 So. 259, it was held that it was only those cases of strong and deep impressions which closes the mind against testimony offered in opposition which constitute disqualification. It was also said that light impressions which might be said to yield to the testimony and leave the mind open to a fair consideration of the case did not disqualify a juror. See, also, *Howell* v. *State,* 107 Miss. 568, 65 So. 641.

It is the province of the circuit judge to determine from a full examination of the juror whether he can try the case fairly and impartially or not.

Other cases than the ones we have cited above have held jurors disqualified, although they stated on oath that they could go into the box and try the defendant fairly, without bias, prejudice, or any desire to reach any other result than the law and the evidence would lead to.

It is somewhat difficult to draw the line of demarcation between the cases and to harmonize entirely all the utterances of the court upon the subject. Much, of course, depends upon the particular questions propounded and the answers given in each particular case. The trial judge has the advantage of having the juror before him and the oppurtunity afforded by his appearance, his apparent candor, his intelligence, and other elements, which the court here cannot have. The presumption of correctness attends the judgment of the lower court in ruling upon such questions, and, unless this court can see that the court below acted erroneously or improperly, we will not reverse a conviction in such case. The trial judge should resolve doubts in his mind

on these propositions in favor of the accused person. In the case before us the defendant did not seek a change of venue. The examination of the different veniremen shows that the matter had been considerably discussed over the county. As the defendant did not apply for a change of venue, and as the state could not do so, the trial must be had in the county of the commission of the crime. Under such circumstances there is much difficulty in getting men competent to serve who have no opinion whatever upon the question, and, where a man has an opinion, although that opinion may yield readily to the evidence, it will not be removed until some evidence at least has been introduced.

While it is true that the defendant must be tried by an impartial jury, whether guilty or innocent (*Jones* v. *State,* 97 Miss. 269, 52 So. 791), and while even though he confesses guilt he is entitled to have the jury fix the punishment, and to secure such right is entitled to a fair and impartial jury, yet, looking at the trial as a completed thing, and viewing the record as a whole, we are unable to say that there is any probability that the defendant would secure a life sentence on the record before us.

We do not think the evidence in the present case is any stronger on the question of fixed opinions than in the other cases we have had before us, and we are unable to say that the jury was not a fair and impartial jury. There is but little in the record, if anything at all, that would warrant the belief that any jury who believed in capital punishment would render any other verdict than the one here rendered.

As to the alleged confessions, we think the record shows clearly that such confessions were free and voluntary within the meaning of the law; that the court committed no error in admitting these confessions.

With reference to the dying declaration of the deceased, we are not satisfied, beyond reasonable doubt, that the declarant realized that he was *in extremis* at the time the statements were made. But the statements

made were not harmful in the present case, because the defendant voluntarily testified to having killed the deceased and to the facts that made it murder under the law, and the *corpus delicti,* was fully established by other evidence than the dying declarations of the deceased, or the confessions of the defendant.

Taking the facts outside of these statements, there can be no doubt in the minds of reasonable men that the *corpus delicti* was fully proven.

The statements complained of in the arguments of the district attorney are not set out in a special bill of exceptions signed by the judge, nor do the stenographer's notes show what statements were made by the district attorney, but only set forth the effect or conclusion of the appellant's attorney with reference thereto. The law requires the statements to be set out with sufficient certainty and with sufficient detail to indicate clearly the scope of the argument, and there must be a bill of exceptions taken and signed by the trial judge during the trial, or the minutes of the trial court must recite the alleged statements. *Powers* v. *State,* 83 Miss. 691, 36 So. 6.

With reference to the juror, Taylor, and the statements claimed to have been made by him prior to his acceptance as a juror, shown in the motion for a new trial, these are insufficient to comply with the rule in *Lipscomb* v. *State,* 76 Miss. 223, 25 So. 158, which requires not only an affidavit from the client that he did not know of such statements at the time of the acceptance of the jury, but also of that of the attorney representing him that he did not know of such statements.

After a thorough consideration of the record, we are unable to find any reversible error. The judgment of the court will therefore be affirmed, and Friday, March 19, 1926, set for the date of execution.

*Affirmed.*

ANDERSON, J., takes no part in this decision.